**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leroy McGill, | No. CV-12-01149-PHX-JJT |
| Petitioner, | |
| v. | **ORDER** |
| Charles L. Ryan, *et al.,* | |
| Respondents. | |

Before the Court is Petitioner's motion for evidentiary development. (Doc. 57.) Petitioner seeks expansion of the record, discovery, and an evidentiary hearing on six of the claims in his habeas petition. (Doc. 30.) Respondents oppose evidentiary development. (Doc. 75.) The motion is denied in part, as set forth herein.

**I.    BACKGROUND**

In 2004, a jury convicted Petitioner of first-degree murder and other counts and sentenced him to death. The following summary is taken from the opinion of the Arizona Supreme Court affirming Petitioner's convictions and death sentence. *State v. McGill*, 213 Ariz. 147, 150–51, 140 P.3d 930, 933–34 (2006).

In July 2002, Petitioner was living in Sophia Barnhart's house, along with his girlfriend, Jonna "Angel" Hardesty, and an acquaintance named Justin Johnson.

Jack Yates had an apartment in a duplex within walking distance of Barnhart's home. Hardesty's brother, Jeff Uhl, sometimes stayed in Yates' apartment. Eddie and

Kim Keith, along with their two daughters, also stayed with Yates, as did Charles Perez and his girlfriend, Nova Banta.

On July 12, 2002, Petitioner, Hardesty, Barnhart, and Johnson spent the evening at Barnhart's house. At approximately 3:30 a.m. on July 13, Petitioner went to Yates' apartment. Uhl and Eddie Keith came out of the apartment to talk with Petitioner. Petitioner told Keith to get his wife and children out of the apartment because he "was going to teach [Perez] and [Yates] a lesson, that nobody gets away with talking about [Petitioner and Hardesty]."[1] In response to Keith's pleading, Petitioner agreed to spare Yates, but said it was too late for Perez. Petitioner also told Keith that he "was the only one who knew about it and that if anybody said anything about it, that [Petitioner] would know who said it." He then remarked that Keith "had pretty little girls." Keith and his family fled the apartment.

Uhl admitted Petitioner into the apartment shortly thereafter. Perez and Banta were sitting next to each other on a couch. Banta testified that Petitioner "turned around and looked at me and [Perez] and said [Perez] shouldn't talk behind other people's backs, and he poured the gasoline on us and quickly lit a match and threw it at us." Petitioner told witnesses that he had added pieces of a Styrofoam cup to the gasoline to create a napalm-like substance that would stick to his victims and cause them more pain. Perez and Banta, both engulfed in flames, ran out of the apartment.

Yates and Uhl also escaped the apartment, which had caught on fire. When firefighters arrived, the apartment was fully engulfed in flames.

At the hospital, Perez screamed "Help me, help me. Get the pain away." Burns covered eighty percent of his body. He died the next day.

Third degree burns covered three-quarters of Banta's body. At the hospital, Banta identified Petitioner as the person who set her on fire.

---

[1] Perez and Banta had recently accused Petitioner and Hardesty of stealing a shotgun from Yates' apartment.

- 2 -

A grand jury indicted Petitioner for the first-degree premeditated murder of Charles Perez, the attempted first-degree murder of Nova Banta, two counts of arson, and endangerment.

At trial, Banta identified Petitioner as the man who attacked her. She also showed the jury the injuries she sustained from the fire. Dr. Phillip Keen testified to the nature and extent of Perez's injuries. The defense put on one witness, Sophia Barnhart, who claimed that Petitioner was not involved with the fire. The jury convicted on all counts.

At the close of the aggravation phase of the trial, the jury unanimously found that McGill had been convicted of prior serious offenses, A.R.S. § 13–703(F)(2); that he knowingly created a grave risk of death to persons other than the victim, A.R.S. § 13–703(F)(3); and that he committed the offense in both an "especially cruel" and an "especially heinous or depraved" manner, A.R.S. § 13–703(F)(6).

In the penalty phase, Petitioner put on evidence that he had experienced an abusive childhood; that he was psychologically immature and, as a result, his girlfriend had greater than normal influence over him; that he suffered from some degree of mental impairment; that he performed well in institutional settings; and that his family cares about him. The State put on rebuttal evidence, including evidence that while awaiting trial Petitioner attempted to have a potential witness against him killed. The jury found that Petitioner's mitigation evidence was not sufficiently substantial to call for leniency and determined that death was the appropriate sentence. The Arizona Supreme Court affirmed. *McGill*, 213 Ariz. at 163, 140 P.3d at 946.

On June 1, 2010, Petitioner filed a petition for post-conviction relief ("PCR") raising several claims of ineffective assistance of counsel. Petitioner alleged that trial counsel performed ineffectively by failing to adequately prepare the defense neuropsychologist, Dr. Richard Lanyon, who testified in mitigation; failing to retain additional experts and develop significant mitigation evidence; failing to present mitigation evidence of cognitive impairment, sexual abuse, and neglect; and failing to challenge his prior convictions. (Doc. 35, Ex. CC.)

The court dismissed all but one of the claims as not colorable. (*Id.*, Ex. JJ.) The court found that Petitioner had stated a colorable claim with respect to his allegation that counsel should have "retained additional experts to investigate further the defendant's alleged brain damage and to corroborate Dr. Lanyon's conclusions, particularly one who could have shown a causal nexus between his impairment and the crime." (*Id.* at 4, 6.) The court ordered an evidentiary hearing on the claim. (*Id.*)

In October 2011, the PCR court conducted an evidentiary hearing, during which Petitioner presented testimony from Dr. Lanyon and lead trial counsel, Maria Schaffer, plus two additional expert witnesses, Drs. Joseph Wu and Richard Rosengard. (*Id.*, Ex's LL, MM.) Following the hearing, the court denied relief. (*Id.*, Ex. Y, at 4–11.6) The Arizona Supreme Court denied review on May 30, 2012. (*Id.*, Exhibit AA.)

Petitioner filed his petition for writ of habeas corpus in this Court on April 8, 2013. (Doc. 30.)

## II.   DISCUSSION

Petitioner seeks evidentiary development on the following claims in his habeas petition: Claim 1 (alleging ineffective assistance of trial counsel in presenting mitigation evidence at sentencing); Claim 2 (ineffective assistance of counsel at the aggravation phase); Claim 4 (ineffective assistance of counsel for failing to challenge arson evidence); Claim 5 (alleging that the prosecution solicited and failed to correct false testimony), Claim 6 (ineffective assistance of counsel for failing to adequately cross-examine a witness), and Claim 7 (alleging that the prosecution failed to disclose impeachment evidence).

Federal habeas claims are analyzed under the framework of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Pursuant to 28 U.S.C. § 2254(d), a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). In *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785–86 (2011), the Supreme Court clarified that under § 2254(d), "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

In *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011), the Court reiterated that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *See Murray v. Schriro*, 745 F.3d 984, 998 (9th Cir. 2014) ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1)."). The Ninth Circuit has observed that "*Pinholster* and the statutory text make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well." *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n.6 (2013) (citing § 2254(d)(2) and *Pinholster*, 131 S. Ct. at 1400 n.7). Therefore, as the court explained in *Gulbrandson*:

> for claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of § 2254(d). This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d).

*Id.* at 993–94.

### A.   Claims 1 and 2

In Claim 1, Petitioner alleges that counsel performed ineffectively at sentencing by failing to develop a relationship of trust with Petitioner that would have resulted in the discovery of additional mitigating evidence; failing to obtain additional school, out-of-home-placement, and medical records; failing to prepare Dr. Lanyon by providing him

1   with pre-sentence and police reports; failing to retain and present testimony from
2   additional mental health experts; and failing discover and present additional evidence of
3   substance abuse and childhood sexual assault. (Doc. 30 at 67–80.).

4   The PCR court rejected this claim after holding an evidentiary hearing on the
5   allegation counsel should have presented additional mental health evidence at sentencing.
6   (*See* Doc. 35, Ex. Y.) Petitioner contends that the state court's decision constituted an
7   unreasonable application of clearly established federal law and was based on an
8   unreasonable determination of the facts under 28 U.S.C. § 2254(d)(1) and (2). (Doc. 30 at
9   55.)

10  In Claim 2, Petitioner alleges that trial counsel performed deficiently at the
11  aggravation phase of sentencing by failing to challenge the prior serious offense
12  aggravating circumstance. (Doc. 30 at 85.) Petitioner contends that trial counsel should
13  have presented evidence that he suffered from brain injury and cognitive dysfunction, and
14  that at the time of the prior offenses he was intoxicated and unarmed. (*Id.* at 86, 88.)

15  Petitioner raised this claim in his PCR petition. The PCR court rejected it is as not
16  colorable, finding that Petitioner's allegations regarding brain damage were "speculative
17  and not substantiated" and contradicted by the fact that he testified in detail about the
18  crimes at trial. (Doc. 35, Ex. JJ at 5–6.) Petitioner contends that the PCR court's decision
19  was based on an unreasonable determination of the facts. (Doc. 30 at 85.)

20  In support of Claims 1 and 2, Petitioner seeks discovery, expansion of the record,
21  and an evidentiary hearing. (Doc. 57 at 10–29.) Respondents counter that evidentiary
22  development is foreclosed under *Pinholster* because the state court addressed the claims
23  on the merits. (Doc. 75 at 18, 22–23.)

24  Petitioner asserts that *Pinholster* does not limit the Court's ability to allow
25  evidentiary development of claims that were not fully developed in state court despite his
26  diligence. (Doc. 57 at 2–3.) He argues that "*Pinholster* cannot be interpreted to prevent
27  evidentiary development of claims made by diligent petitioners whose attempts at factual
28

development in state court were thwarted by the state court itself." (Doc. 76 at 2.) Petitioner's argument is not supported by *Pinholster* or subsequent cases.

"While allowing a petitioner to supplement an otherwise sparse trial court record may be appealing, especially where he diligently sought to do so in state court, the plain language of *Pinholster* and *Harrington* precludes it." *Ballinger v. Prelesnik,* 709 F.3d 558, 562 (6th Cir. 2013); *see Atkins v. Clarke*, 642 F.3d 47, 49 (1st Cir. 2011) (rejecting argument that a state court did not adjudicate claim on the merits unless petitioner was afforded a "full and fair evidentiary hearing"); *see also Donaldson v. Booker*, 505 Fed.Appx. 488, 493 (6th Cir. 2012) (finding *Pinholster* applies in cases where "petitioner requested an evidentiary hearing in state court and was thereby not at fault for failure to develop the factual record in state court"); *Taylor v. Simpson*, No. 06-CV-181-JBC, 2012 WL 404929, at *3 (E.D.Ky. February 6, 2012) ("Notwithstanding Taylor's argument that *Pinholster* addressed only a fully developed claim, adjudicated on the merits in state court, and decided in federal court under § 2254(d)(1) and that *Pinholster* did not concern habeas litigation under § 2254(d)(2), he is not entitled to discovery on his *Batson* claim under 2254(d)(2)."); *Lewis v. Ayers*, No. 02-13-KJM-GGH-DP, 2011 WL 2260784, at *5-6 (E.D.Cal. June 7, 2011) ("Nor will an assertion—that because the state record was incomplete, there was no adjudication on the merits—operate to avoid the [*Pinholster*] holding. An adjudication on the merits is just that regardless of one's view on the completeness of the record on which the ruling was made.").

Petitioner further contends that *Pinholster* does not preclude the consideration of new evidence because the claim "satisfies" § 2254(d). (Doc. 76 at 2.) Petitioner is correct that *Pinholster* does not bar evidentiary development where the court has determined, based solely on the state court record, that the petitioner "has cleared the § 2254(d) hurdle." *Madison v. Commissioner, Alabama Dept. of Corrections*, 761 F.3d 1240, 1249–50 (11th Cir. 2014); *see Pinholster*, 131 S. Ct. at 1400–01; *Henry*, 720 F.3d at 1093 n.15 (explaining that *Pinholster* bars evidentiary hearing unless petitioner satisfies § 2254(d)).

- 7 -

Accordingly, with respect to Claims 1 and 2, Petitioner's motion for evidentiary development will remain under advisement while the Court undertakes an analysis of the claims under § 2254(d) based on the evidence before the PCR court.

### **B.**     **Claims 4 and 6**

In Claim 4, Petitioner alleges that trial counsel performed ineffectively by failing to challenge the State's arson experts. (Doc. 30 at 93–98.) In Claim 6, Petitioner alleges that trial counsel performed ineffectively by failing to adequately investigate and cross-examine witness Justin Johnson regarding the circumstances of his police interview. (*Id.* at 102.)

These claims are procedurally defaulted because Petitioner did not present them in state court. Petitioner contends that his default of the claims is excused under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), by the ineffective assistance of PCR counsel. (Doc. 30 at 93, 102; Doc. 57 at 29–30, 36.) The Court disagrees. As discussed below, the claims are not "substantial" as required by *Martinez*.

Federal review is generally not available for a state prisoner's claims when those claims have been denied pursuant to an independent and adequate state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In such situations, "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Id. Coleman* further held that ineffective assistance of counsel in post-conviction proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez*, the Court established for the first time a "narrow exception" to the rule announced in *Coleman*. The Court explained:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

1   132 S. Ct. at 1320; *see also Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (noting that *Martinez* may apply to a procedurally defaulted trial-phase ineffective assistance of counsel claim if "the claim . . . was a 'substantial' claim [and] the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding" (quoting *Martinez,* 132 S. Ct. at 1320)).

Accordingly, under *Martinez* a petitioner may establish cause for the procedural default of an ineffective assistance claim "where the state (like Arizona) required the petitioner to raise that claim in collateral proceedings, by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* . . .' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 132 S. Ct. at 1318); *see Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014); *Dickens v. Ryan*, 740 F.3d 1302, 1319–20 (9th Cir. 2014) (en banc); *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc).

In a series of recent cases, the Ninth Circuit has provided guidelines for applying *Martinez.* The most recent case, *Clabourne*, summarizes the court's *Martinez* analysis. To demonstrate cause and prejudice sufficient to excuse the procedural default, a petitioner must make two showings. "First, to establish 'cause,' he must establish that his counsel in the state postconviction proceeding was ineffective under the standards of *Strickland. Strickland*, in turn, requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Clabourne*, 745 F.3d at 377 (citations omitted). Determining whether there was a reasonable probability of a different outcome "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Id.* at 377–78. Second, "to establish 'prejudice,' the petitioner must establish that his

- 9 -

"underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.*

Under *Martinez*, a claim is substantial if it meets the standard for issuing a certificate of appealability. *Martinez*, 132 S. Ct. 1318–19 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). According to that standard, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Detrich*, 740 F.3d at 1245 (quoting *Miller-El*, 537 U.S. at 336).

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 674 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes,* 558 U.S. 15 (2009) (per curiam); *Bobby v. Van Hook,* 558 U.S. 4 (2009) (per curiam); *Cox. v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.* at 687–88.

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

**Claim 4**

Petitioner alleges that trial counsel should have challenged evidence that Petitioner added Styrofoam to the gasoline he threw on the victims. (Doc. 30 at 93–98.) He argues that counsel performed deficiently by failing to present an arson expert and failing to challenge the testimony of the State's experts. (*Id.* at 95–96.) He contends that he was prejudiced because the jury found the murder especially cruel, heinous and depraved, and because the Arizona Supreme Court, in its independent review of his sentence, relied on the Styrofoam evidence in its cruelty analysis. (*Id.* at 97–98.) In support of the claim, Petitioner seeks expansion of the record and an evidentiary hearing to present testimony from trial counsel, a criminalist retained by trial counsel, the State's arson investigators, and a *Strickland* "standard of care" expert. (Doc. 57 at 30–33.)

Claim 4 is not substantial. Trial counsel did not perform deficiently by failing to challenge the State's experts. The evidence showing that Petitioner placed Styrofoam in the gasoline came from Justin Johnson, who testified that he heard Petitioner talk about using Styrofoam (RT 10/20/04 at 120–21), and from Detective Thomas Kulesa, who testified that Petitioner stated there was Styrofoam in the gasoline used on the victims.[2] (RT 10/25/04 at 44–45.) The State's experts, Bernard Caviglia, a Phoenix Fire Department arson investigator, and criminalist Paul Landvatter, did not testify that Styrofoam was used. Caviglia did not mention Styrofoam in his testimony until he responded to a question from a juror who asked if Styrofoam had been used as an accelerant in the gasoline. (RT 10/21/04 at 106.) Caviglia testified that there was no evidence Styrofoam was used and stated he did not know if it was even possible because he believed gasoline would "just deteriorate the Styrofoam." (*Id.*) Landvatter, also in response to a jury question, testified that in his analysis he did not find the breakdown

---

[2] "RT" refers to the court reporter's transcript.

- 11 -

1 products he would have expected to see if Styrofoam had been present in the gasoline.
2 (RT 10/25/04 at 94.)

3 More importantly, Petitioner was not prejudiced by this aspect of counsel's performance. There was no reasonable probability of a different sentence if counsel had attempted to counter evidence that the gasoline was mixed with Styrofoam. As the Arizona Supreme Court explained, under A.R.S. § 13–703(F)(6) "[c]ruelty exists if the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur. . . . Setting a conscious person on fire necessarily causes the victim tremendous suffering." *McGill*, 213 Ariz. at 155, 140 P.3d at 938 (citation omitted).

Whether or not the gasoline mixture contained pieces of Styrofoam, there is no doubt that Perez experienced physical pain when he was burned over 80 percent of his body. There is no reasonable probability that the jury or the Arizona Supreme Court would have found the murder was not especially cruel if trial counsel had managed to prove that the gasoline used to burn Perez to death did not contain Styrofoam.

The claim is not substantial under *Martinez*. Therefore, Petitioner fails to meet the prejudice prong of the cause and prejudice analysis, *see Clabourne*, 745 F.3d at 377, and default of the claim is not excused. Because the claim is defaulted and procedurally barred, Petitioner is not entitled to evidentiary development.

**Claim 6**

Petitioner alleges that trial counsel performed deficiently by failing to elicit evidence that Justin Johnson "only spoke with the police after he was arrested and under the expectation that he would be permitted to walk out of the police station rather than face jail." (Doc. 30 at 100.) He asserts that he was prejudiced by counsel's failure to undermine Johnson's credibility. (*Id.* at 103–04.)

With respect to Claim 6 and the related Claim 5, alleging that the State solicited and failed to correct Johnson's false testimony, Petitioner seeks expansion of the record to include the video of Johnson's police interview and discovery in the form of

- 12 -

depositions of trial counsel, Johnson, and various police officers. (Doc. 57 at 36–40.) These requests will be denied. Claim 6 is not substantial, so its default is not excused under *Martinez*.

Johnson testified that on the night of July 12, 2002, and in the early morning hours of July 13, he was at Barnhart's apartment with Barnhart, Petitioner, and Hardesty. (RT 10/20/04 at 105–07.) According to Johnson, he and Petitioner left Barnhart's apartment around 3:30 am on July 13, and separately went to Yates' apartment. (*Id.* at 107.) Before leaving, Petitioner said that he was going to "take care of something." (*Id.* at 109.) When Johnson arrived at Yates' apartment, Uhl and Petitioner were standing nearby and Uhl called him over and told him not to go inside Yates' apartment. (*Id.* at 108, 111.) Johnson testified that after he returned to Barnhart's apartment Hardesty received a phone call. (*Id.* at 112–14.) Hardesty said the call was from Petitioner, who had called and asked her "if it smelled like burning flesh." (*Id.* at 113-14.) Johnson testified that Petitioner then returned to Barnhart's apartment out of breath and smelling of gas. (*Id.* at 114–15.) According to Johnson, Petitioner stated that he poured gasoline on Banta and Perez and lit a match and threw it on Banta. (*Id.* at 116.) Johnson also testified that he heard Petitioner say he added Styrofoam to the gasoline to cause more pain and make the flames more difficult to put out. (*Id.* at 120–21.)

Johnson testified that he did not go to the police immediately because he "feared of my life and my family's." (*Id.* at 122.) When asked by the prosecutor why he eventually went to the police, he explained that, "A detective had contacted my father and told him that they needed me to help in the case, and my father told him that my son has warrants; he will be afraid to talk to 'em. And he said don't worry about the warrants. We just need to talk to him. And I contacted the detective." (*Id.* at 122–23.) On cross-examination, Johnson admitted that he did not contact the police until May of 2004, almost two years after the murder, when Banta, a close friend, asked for his help in putting Petitioner away. (*Id.* at 125–26.) Johnson also stated that he did not know if his warrants were cleared, but that he had recently been pulled over and the officer did not

- 13 -

1  mention any warrants. (*Id.* at 128–29.) Johnson further testified that Detective Kulesa
2  said he would "take care of" his warrants. (*Id.*)

3  Detective Kulesa testified that Johnson "eventually came into the police station"
4  after he informed Johnson that he would not be arrested on an outstanding warrant.
5  (RT 10/25/04 at 30-31, 66.)

6  Petitioner asserts that recordings of Johnson's May 2004 police interview show
7  that he was arrested immediately before providing his statement to the police. (Doc. 30 at
8  100.) The interview tapes show that Johnson made two phone calls while he was alone in
9  the interview room. (*Id.*) During the phone calls, Johnson stated that he had been arrested
10 and taken into custody and that following his arrest he told the police that he "needed to
11 talk to homicide." (*Id.*) Johnson also said he thought the detective would take care of his
12 warrant and that he would probably get to "walk out of [t]here." (*Id.*)

13 Petitioner contends that trial counsel performed deficiently by failing to
14 investigate and review the police interviews and use the information to attack Johnson's
15 credibility. (Doc. 30 at 103.) Petitioner argues that he "was prejudiced by trial counsel's
16 failure to adequately cross-examine Johnson" because "Johnson was a key state witness,
17 who provided damaging testimony both as to McGill's guilt and the aggravating
18 circumstances." (*Id.* at 103–04.) Petitioner further argues that Johnson's credibility was a
19 key issue because his version of events was contradicted by the trial testimony of Sofia
20 Barnhart, who testified that Petitioner and Johnson were both at her apartment all night
21 and that Petitioner never made any statements indicating that he was involved in the fire.
22 (*Id.*; *see* RT 10/26/04 at 12–15.)

23 Claim 6 is not substantial because trial counsel's failure to impeach Johnson's
24 testimony about the circumstances surrounding his May 2004 police interview did not
25 prejudice Petitioner. Johnson's testimony about Petitioner's activities before and after the
26 fire are cumulative to and corroborated by other evidence, most significantly Nova
27 Banta's unequivocal testimony that Petitioner was the person who threw gasoline on her

and Perez and lit them on fire.[3] (RT 10/20/04 at 48–51, 53, 65, 74–75.) In addition, three nurses who treated Banta immediately following her arrival at the hospital testified that she identified "Leroy" as the person who caused her injuries. (*Id.* at 143, 182, 190.)

Edwin Keith testified that moments before the fire Petitioner said that he was going "to teach Charlie and Jack a lesson," threatened to harm Keith's family if anyone found out about what McGill was going to do, and told Keith to get his family out of Yates' apartment. (*Id.* at 157–58.) Moreover, Johnson's testimony that Petitioner admitted putting Styrofoam in the gasoline to enhance the attack was corroborated by Petitioner's similar statements to Detective Kulesa. Finally, while Barnhart testified that Petitioner was at her apartment all night, Detective Kulesa testified that when he interviewed Petitioner, Petitioner admitted to being present at Yates' apartment when the fire started. (RT 10/25/04 at 34–44.)

The most significant aspect of Johnson's testimony was corroborated by the overwhelming evidence identifying Petitioner as the person who doused the victims in gasoline and lit them on fire. There is not a reasonable probability that the jury would have reached a different verdict if it had heard additional, contradictory details about the circumstances of Johnson's police interview. *Strickland*, 466 U.S. at 694. There is not a reasonable probability that the jury would not have sentenced Petitioner to death if counsel had impeached Johnson's credibility with evidence that he did not voluntarily report the information to the police.

The claim is not substantial under *Martinez*. Therefore, Petitioner fails to meet the prejudice prong of the cause and prejudice analysis, *see Clabourne*, 745 F.3d at 377, and default of the claim is not excused. Because the claim is defaulted and procedurally barred, Petitioner is not entitled to evidentiary development.

---

[3] In her closing argument, the prosecutor emphasized the significance of Banta's testimony, explaining "that it all comes down to that one question: Was Nova Banta telling the truth. . . . Nova Banta is the key to this case." (RT 10/26/04 at 44.)

### C. Claims 5 and 7

Petitioner concedes that Claims 5 and 7, alleging, respectively, violations of *Napue* and *Brady*, are unexhausted because they were never presented in state court.[4] (Doc. 30 at 98, 104.) He indicates, however, that at "the appropriate time" he intends to seek a stay of these proceedings under *Rhines v. Weber*, 544 U.S. 269 (2005), to exhaust the claims in state court. (*Id.*) The claims will be denied as plainly meritless.[5] *See Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (explaining that the court may deny an unexhausted claim on the merits where it is "perfectly clear" that the claim is not colorable); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

**Claim 5**

Citing *Napue v. Illinois*, 360 U.S. 264 (1959), Petitioner alleges that the State knowingly presented false testimony from Justin Johnson in violation of Petitioner's rights under the Fifth and Fourteenth Amendments. (Doc. 30 at 98–102.)

To prevail on a *Napue* claim, a petitioner must show that (1) the testimony or evidence was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material. *United States v. Zuno–Arce*, 339 F.3d 886, 889 (9th Cir. 2003) (citing *Napue*, 360 U.S. at 269–71); *see Morris v. Ylst*, 447 F.3d 735, 743 (9th Cir. 2006). Claim 5 fails because Petitioner cannot show that the testimony surrounding the circumstances of Johnson's police interview in May 2004 was material.

---

[4] Citing *Martinez*, Petitioner argues that PCR counsel's ineffectiveness in failing to raise this claim provides cause and prejudice to excuse his procedural default. (Doc. 30 at 98–99.) *Martinez*, however, only applies to excuse the procedural default of ineffective assistance of counsel claims. 132 S. Ct. at 1318.

[5] A stay is only appropriate under *Rhines* when this Court "determines there was good cause for the petitioner's failure to exhaust his claims first in state court." 544 U.S. at 277. Petitioner has made no effort to show good cause under *Rhines*. Even if Petitioner has shown good cause, this Court "would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." *Id.*

- 16 -

1 Failure to disclose information that might have been helpful in conducting cross-
2 examination amounts to a constitutional violation only if it deprives the defendant of a
3 fair trial. *United States v. Bagley*, 473 U.S. 667, 676 (1985). The failure to disclose such
4 evidence is material, and therefore prejudicial, "if there is a reasonable probability that,
5 had the evidence been disclosed to the defense, the result of the proceeding would have
6 been different." *Strickler v. Greene*, 527 U.S. 263, 280, 282 (1999) (quoting *Bagley,* 473
7 U.S. at 682); *see United States v. Agurs*, 427 U.S. 97, 112 (1976) (explaining that relief is
8 warranted only "if the omitted evidence creates a reasonable doubt that did not otherwise
9 exist").

10 As discussed above, there was overwhelming evidence, independent of Johnson's
11 testimony, that Petitioner committed the murder and that the murder was especially cruel.
12 Neither the conviction nor the sentence would have been different if the State had
13 disclosed evidence that Johnson shared his information with the police only after being
14 arrested.

15 Claim 5 is denied as plainly meritless.

16 **Claim 7**

17 Petitioner alleges that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963),
18 by failing to disclose information indicating that in 1998 Edwin Keith had been suspected
19 of, but never charged with, child molestation. (*Id.* at 104–07.)

20 Under *Brady*, the government has a constitutional obligation to disclose material,
21 favorable information to the defense. *Brady* is violated where (1) the evidence in question
22 was favorable to the accused, (2) the government willfully or inadvertently suppressed
23 the evidence, and (3) prejudice resulted from the suppression (i.e., the evidence was
24 "material"). *See Strickler*, 527 U.S. at 281–82; *Banks v. Dretke*, 540 U.S. 668, 691
25 (2004). Evidence is material for *Brady* purposes "if there is a reasonable probability that,
26 had the evidence been disclosed to the defense, the result of the proceeding would have
27 been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *Bagley*, 473 U.S. at
28 682). "In other words, favorable evidence is subject to constitutionally mandated

disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Cone v. Bell*, 556 U.S. 449, 470 (2009) (quoting *Kyles,* 514 U.S. at 435). The duty to disclose includes impeachment as well as exculpatory material. *Bagley*, 473 U.S. at 676.

Keith testified at trial that he was living with his wife Kimberly and their two young daughters at Yates' apartment at the time of the murder. (RT 10/20/04 at 151.) About 10 minutes before the fire, Jeff Uhl told Keith to leave the apartment. (*Id.* at 156.) Keith went outside and saw Petitioner. (*Id.* at 157.) Petitioner, who was holding a cup in his hand, told Keith he was "going to teach Charlie and Jack a lesson, that nobody gets away with talking about [Petitioner's] family." (*Id.* at 158, 167, 170.) Keith testified that he asked Petitioner not to harm the men:

> I asked him not to hurt Jack. Jack had always helped me. He told me that he wouldn't and that I would owe him one. And then he said anything else? I asked for Charlie. He said, no, it was too late. So I said okay, and then he told me that I was the only one who knew about it and that if anybody said anything about it, that he would know who said it, and he also told me that I had pretty little girls.

(*Id.* at 158.)

Petitioner then told Keith to get his wife and kids out of the house. (*Id.*) Keith gathered his family and drove about two blocks away. (*Id.* at 159–60.) A few minutes later they saw smoke and heard sirens. (*Id.*)

The police interviewed Keith shortly after the fire, but he did not tell them what had occurred because, according to his trial testimony, he feared for his family. (*Id.* at 160–61.) Eventually, however, when he was interviewed before trial, he admitted having lied to the police. He then provided the information included in his testimony. (*Id.* at 161–62.) Keith testified that he decided to tell the truth because he was no longer worried about his family's safety and because the prosecutor had assured him he would not be charged for providing false information to the police. (*Id.* at 162–63, 167.)

Petitioner argues that the State violated *Brady* by failing to disclose the fact that Keith "was suspected of child molestation in 1998 and that charges were not pursued

1   because the minor victim's father did not want the investigation to move forward."
2   (Doc. 30 at 105.) Respondents counter that the information "was not *Brady* material, and
3   even if it was, there is no probability whatsoever that, had it been disclosed, the result of
4   the proceeding would have been different." (Doc. 34 at 81.) The Court agrees.

5         First, information that Keith had been suspected of child molestation could not
6   have been used to impeach his credibility because it was not admissible under Arizona
7   Rules of Evidence. The information would not have been admissible under Rule 609
8   because it did not result in a criminal conviction. Ariz. R. Evid. 609. It would not have
9   been admissible under Rule 608(b) because it was not probative of Keith's character for
10  truthfulness. Ariz. R. Evid. 608(b) (stating that specific instances of a witness's conduct
11  may be inquired into on cross-examination "if they are probative of the character for
12  truthfulness or untruthfulness").

13        Petitioner's *Brady* claim also fails because there is no probability that the outcome
14  of his trial would have been different if the information had been disclosed. In his
15  testimony, Keith admitted that he had prior convictions for auto theft and for drug crimes,
16  that he was on probation, that he was a drug addict, and that he had used
17  methamphetamine on the day of Petitioner's crimes. (RT 10/20/04 at 163–66.) He also
18  admitted that he initially lied to the police, and only provided information regarding what
19  he knew about the crimes after he was called in for a pre-trial interview and the
20  prosecutor assured him he would not be charged with providing false information. (*Id.* at
21  160–63, 167.)

22        In light of the impeachment evidence introduced at trial, there is no reasonable
23  probability that, had the jury been informed that Keith was once suspected of child
24  molestation but was never arrested or charged, the trial's outcome would have been
25  different. Additionally, Keith's testimony implicating Petitioner was corroborated by
26  Banta's unequivocal identification of Petitioner as her attacker. Even if Petitioner had
27  established that the information regarding Keith was impeaching, and therefore *Brady*
28  material, there is no reasonable probability that the verdict or sentence would have been

different had the information been disclosed. *See Cone*, 556 U.S. at 469–70. The information could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Claim 7 is denied as plainly meritless.

### III. CONCLUSION

With respect to the claims adjudicated on the merits in state courts, Claims 1 and 2, the Court takes Petitioner's request for evidentiary development under advisement. The Court denies Petitioner's request for evidentiary development on Claims 4, 5, 6, and 7.

**IT IS ORDERED DENYING** Petitioner's motion for evidentiary development (Doc. 57) as set forth herein.

**IT IS FURTHER ORDERED DENYING** Claims 4 and 6 as procedurally barred and Claim 5 and 7 as meritless.

Dated this 30th day of March, 2015.

Honorable John J. Tuchi
United States District Judge