**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leroy McGill, | No. CV-12-01149-PHX-JJT |
| Petitioner, | **ORDER** |
| v. | <u>DEATH PENALTY CASE</u> |
| Charles L. Ryan, et al., | |
| Respondents. | |

Before the Court is Petitioner Leroy McGill's petition for writ of habeas corpus. (Doc. 30.) Respondents filed an answer and McGill filed a reply. (Docs. 34, 43.)

The Court previously denied, in part, McGill's motion for evidentiary development. (Doc. 78.) In doing so the Court denied Claims 4 and 6 as procedurally barred and Claims 5 and 7 as meritless. (*Id.*) McGill subsequently withdrew Claims 8 and 9. (Doc. 43 at 53.) The Court rules on the remaining claims as follows.

## I. BACKGROUND

In 2004, a jury convicted McGill of first-degree murder and other counts and sentenced him to death. The following factual summary is taken from the opinion of the Arizona Supreme Court affirming the convictions and death sentence. *State v. McGill*, 213 Ariz. 147, 150–51, 140 P.3d 930, 933–34 (2006).

In July 2002, McGill was living in Sophia Barnhart's house, along with his girlfriend, Jonna Hardesty, and an acquaintance named Justin Johnson.

Jack Yates had an apartment in a nearby duplex. Hardesty's brother, Jeff Uhl, sometimes stayed in Yates's apartment. Eddie and Kim Keith, along with their two daughters, also stayed with Yates, as did the victims in this case, Charles Perez and his girlfriend, Nova Banta.

On July 12, 2002, McGill, Hardesty, Barnhart, and Johnson spent the evening at Barnhart's house. At approximately 3:30 a.m. on July 13, McGill went to Yates's apartment. Uhl and Eddie Keith came outside to talk with McGill. McGill told Keith to get his wife and children out of the apartment because he was going to teach Yates and Perez, who had previously accused McGill of stealing a gun, "that nobody gets away with talking about [McGill and Hardesty]." McGill agreed to spare Yates, but said it was too late for Perez. Keith and his family fled the apartment.

Uhl let McGill into the apartment. Perez and Banta were sitting next to each other on a couch. McGill told them they should not talk about people behind their backs. Then, as Banta testified, McGill "poured the gasoline on us and quickly lit a match and threw it at us." McGill told witnesses that he had added pieces of Styrofoam to the gasoline to create a napalm-like substance that would stick to the victims and increase their suffering. Perez and Banta, both on fire, ran out of the apartment.

Yates and Uhl also escaped the apartment, which was fully engulfed in flames when firefighters arrived.

Burns covered eighty percent of Perez's body. He died the next day. Third-degree burns covered three-quarters of Banta's body. At the hospital, Banta identified McGill as the person who set her on fire.

A grand jury indicted McGill for the first-degree premeditated murder of Perez, the attempted first-degree murder of Nova Banta, two counts of arson, and endangerment.

At trial, Banta identified McGill as the man who attacked her. She showed the jury the injuries she sustained from the fire. The medical examiner testified about the severity of Perez's injuries. The defense put on one witness, Sophia Barnhart, who claimed that McGill was not involved with the fire. The jury convicted on all counts.

At the close of the aggravation phase of the trial, the jury unanimously found that McGill had been convicted of prior serious offenses, pursuant to A.R.S. § 13-703(F)(2); that he knowingly created a grave risk of death to persons other than the victim, A.R.S. § 13-703(F)(3); and that he committed the offense in both an "especially cruel" and an "especially heinous or depraved" manner, A.R.S. § 13-703(F)(6).[1]

In the penalty phase, McGill offered mitigation evidence that he had experienced an abusive childhood; that he was psychologically immature and as a result his girlfriend, Jonna Hardesty, had greater than normal influence over him; that he suffered from some degree of mental impairment; that he performed well in institutional settings; and that his family cared about him. The State put on rebuttal evidence, including evidence that while awaiting trial McGill attempted to have a potential witness killed. The jury found that McGill's mitigation evidence was not sufficiently substantial to call for leniency and determined that death was the appropriate sentence. The Arizona Supreme Court affirmed. *McGill*, 213 Ariz. at 163, 140 P.3d at 946.

On June 1, 2010, McGill filed a petition for post-conviction relief ("PCR") raising claims of ineffective assistance of counsel. He alleged that trial counsel performed ineffectively by failing to prepare the defense expert, Dr. Richard Lanyon, who testified in mitigation; failing to retain additional experts and develop mitigation evidence; failing to present mitigation evidence of cognitive impairment, sexual abuse, and neglect; and failing to challenge McGill's prior convictions. (Doc. 35, Ex. CC, PCR petition.)

The court dismissed all but one of the claims as not colorable. (*Id.*, Ex. JJ, ME 10/25/10.) The court found that McGill had stated a colorable claim with respect to his allegation that counsel should have "retained additional experts to investigate further the defendant's alleged brain damage and to corroborate Dr. Lanyon's conclusions,

---

[1] At the time of the murder in 2002, Arizona's capital sentencing scheme was set forth in A.R.S. §§ 13-703 and 13-703.01 to -703.04. It is presently set forth in A.R.S. §§ 13-751 to -759. The Court refers throughout this order to the statutes in effect at the time McGill committed the murder.

particularly one who could have shown a causal nexus between his impairment and the crime." (*Id.* at 4, 6.) The court ordered an evidentiary hearing on that claim. (*Id.*)

In October 2011, the PCR court conducted an evidentiary hearing. McGill presented testimony from Dr. Lanyon and lead trial counsel, Maria Schaffer, plus two additional expert witnesses, Drs. Joseph Wu and Richard Rosengard. Following the hearing, the court denied relief. (*Id.*, Ex. Y, ME 10/25/11 at 4–11.6) The Arizona Supreme Court denied review on May 30, 2012. (*Id.*, Exhibit AA.)

McGill filed his petition for writ of habeas corpus in this Court on April 8, 2013. (Doc. 30.)

## II. APPLICABLE LAW

Federal habeas claims are analyzed under the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under the AEDPA, a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d).

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). Under § 2254(d)(1), "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Under § 2254(d)(2), a state court's factual determination is presumed correct and a petitioner bears the burden of overcoming that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Satisfying § 2254(d)(2) is a "daunting" burden, "one that will be satisfied in relatively few cases." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004) *overruled on other grounds by Murray (Robert) v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014). A state court's "factual determination is not unreasonable merely because [a]

federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, a federal habeas court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor*, 366 F.3d at 1000.

In *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), the Supreme Court reiterated that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *See Murray (Robert)*, 745 F.3d at 998 ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1).").

However, *Pinholster* does not bar evidentiary development where the court has determined, based solely on the state court record, that the petitioner "has cleared the § 2254(d) hurdle." *Madison v. Commissioner, Alabama Dept. of Corrections*, 761 F.3d 1240, 1249–50 (11th Cir. 2014); *see Pinholster*, 563 U.S. at 185; *Henry v. Ryan*, 720 F.3d 1073, 1093 n.15 (9th Cir. 2013) (explaining that *Pinholster* bars evidentiary hearing unless petitioner satisfies § 2254(d)); *Williams v. Woodford*, 859 F.Supp.2d 1154, 1161 (E.D. Cal. 2012).

For claims not adjudicated on the merits in state court, federal review is generally not available when the claims have been denied pursuant to an independent and adequate state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In Arizona, there are two avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3).

For unexhausted and defaulted claims, "federal habeas review . . . is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. *Coleman* further held

that ineffective assistance of counsel in PCR proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez v. Ryan*, 566 U.S. 1 (2012), however, the Court established a "narrow exception" to *Coleman*. Under *Martinez*, a petitioner may establish cause for the procedural default of an ineffective assistance claim "by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* . . .' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at 14); *see Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015). The Ninth Circuit has explained that "PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective." *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012).

*Martinez* applies only to claims of ineffective assistance of trial counsel; it has not been expanded to other types of claims. *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (denying petitioner's argument that *Martinez* permitted the resuscitation of a procedurally defaulted *Brady* claim, holding that only the Supreme Court could expand the application of *Martinez* to other areas); *see Davila v. Davis*, 137 S. Ct. 2058, 2062–63 (2017) (explaining that the *Martinez* exception does not apply to claims of ineffective assistance of appellate counsel).

## III.    ANALYSIS

### A.    Ineffective Assistance of Counsel Claims

McGill raises several claims of ineffective assistance of counsel. Claims 1 and 2 concern counsel's performance at sentencing. The claims were raised during McGill's PCR proceedings and denied on the merits. Claim 3 alleges ineffective assistance during jury

selection while Claim 29 alleges ineffective assistance of appellate counsel. These were not raised in state court.

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668, 674 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes*, 558 U.S. 15 (2009) (per curiam); *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). To satisfy *Strickland*'s first prong, a petitioner must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.* at 687–88.

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. As the Court explained in *Richter*:

> Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." [*Strickland*, 466 U.S.] at 689. The question is whether an

attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. [*Id.*] at 690.

The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (additional citations omitted); *see Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (discussing "doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard").

**Claim 1:**

In Claim 1, McGill alleges that counsel performed ineffectively at sentencing by failing to develop a relationship of trust with McGill that would have resulted in the discovery of additional mitigating evidence; failing to obtain additional school, out-of-home-placement, and medical records; failing to prepare Dr. Lanyon by providing him with pre-sentence and police reports; failing to retain and present testimony from additional mental health experts; and failing to discover and present additional evidence of substance abuse and childhood sexual assault. (Doc. 30 at 67–80.)

The PCR court rejected this claim after holding an evidentiary hearing on the allegation that counsel should have presented additional mental health evidence at sentencing. (ME 10/25/11.)[2] McGill contends that the state court's decision constituted an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(1) and (2). (Doc. 30 at 55.)

1.    Sentencing hearing

McGill was represented at trial by lead counsel Schaffer, of the Maricopa County Office of the Legal Advocate, and Elizabeth Todd as second chair. The defense team also

---

[2] "ME" stands for the minute entries of the state court.

included mitigation specialist Marianna Brewer and investigator Mark Mullavey. Schaffer retained Dr. Lanyon, a neuropsychologist who examined McGill and testified at sentencing. Schaffer sought authorization from her office to retain an addictionologist and an expert on domestic abuse. The office denied the latter but authorized Schaffer to retain an addictionologist.

At the sentencing phase of trial McGill's counsel called 10 mitigation witnesses over four days. The witnesses included McGill's mother, grandmother, and siblings Roxanne, Cordell, and Kean McGill. (RT 11/1/04 at 25, 105, 116; RT 11/2/04 at 12, 46.)[3] Mitigation specialist Brewer testified about the results of her investigation into McGill's background, and presented several videotaped interviews, including an interview she conducted with McGill's brother Brian. (RT 11/8/04 at 12.) Brewer also prepared an exhibit, submitted to the jury as an exhibit at sentencing, which included her interview notes and voluminous records documenting McGill's educational, medical, and legal history. (Doc. 34, Ex. S.) Finally, Dr. Lanyon testified about the results of his evaluation of McGill.

Through these witnesses the jury learned about McGill's chaotic, neglectful, and abusive upbringing. McGill's mother, Ann, left his father, Clyde, while she was pregnant with McGill. (RT 11/1/04 at 28.) She moved with her children from California to Phoenix. (*Id.*) Later, Clyde kidnapped McGill and two of his siblings and brought them to California. (*Id.* at 30.) It took four months for Ann to get the children back. (*Id.*)

Although she remarried and had other men in her life, Ann was essentially a single mother raising six children. (*See id.* at 39.) Arthur Foster was her second husband and the father of her sixth child, Lonnie. She divorced him after an assault that left her blind in one eye. (*Id.* at 36–37.) Foster also beat McGill and his brothers. (*Id.* at 45, 125.)

---

[3] RT refers to the court reporter's transcript from McGill's state court proceedings.

Because Ann worked frequently, including nights as a bartender, the children largely fended for themselves, with the older siblings, primarily Roxanne, responsible for looking after the younger children. (*Id.* at 39–40.)

The family moved frequently, from Arizona to New Mexico to Texas and back to Arizona, so McGill attended a number of schools. In 1971, he and Cordell were sent to Buckner's Boys' Ranch, a group home in Texas, after authorities concluded that Ann could not adequately care for her children. (RT 11/1/04 at 40–42; RT 11/3/04, P.M., at 4–6, 8; RT 11/8/04 at 53; Doc. 34, Ex. S at 88–89.) McGill spent two years at Buckner's before returning home. (RT 11/1/04 at 86; RT 11/3/04. P.M., at 12, 15–16, 32–33.)

In 1976, McGill was sent to another group home, Boysville, after being expelled from school for truancy and placed on juvenile probation. (RT 11/1/04 at 48, 84–89, 102; RT 11/3/04, P.M., at 24–30, 33.) Cordell, Kean, and their half-brother, Lonnie Foster, were also at Boysville. Boysville was stricter than Buckner's. There was corporal punishment, and both Cordell and Leroy were disciplined by being spanked with a wooden paddle. (RT 11/2/04 at 31.) The boys were essentially "warehoused" at Boysville. (*Id.* at 32.) It was a "rough place" and there were lots of fights between the boys. (*Id.*) While McGill was in these group homes, his mother visited him infrequently (*See* RT 11/3/04, P.M., at 12, 34, 44.)

McGill left Boysville at age 15 and returned to Phoenix to live with his family. He attended high school but dropped out before graduating. (RT 11/1/04 at 49–50, 53, 89–90; RT 11/3/04, P.M., at 33; RT 11/8/04 at 16–18.) The testimony and records contained in Brewer's exhibit showed that McGill's academic performance was poor. (*See* RT 11/3/04, P.M., at 19, 34.)

Brewer testified at length about her mitigation findings. She testified that McGill claimed to have been injured in a car accident in 1985, with his head crashing through the windshield. (RT 11/8/04 at 19–21, 62–63.) However, Brewer was unable to obtain any medical records documenting McGill's injuries. (*Id.*)

Brewer testified that in 1985 McGill was placed on probation for using another person's credit card. While on probation, he committed two armed robberies and was imprisoned from 1986 to 1993. (RT 11/8/04 at 21–22, 65–66.) McGill was not actually armed during the robberies; he put his hand in his jacket and pretended to have a gun. (*Id.* at 22.)

Brewer testified that McGill's prison record was largely positive. He held a number of jobs, required little or no supervision, attended AA meetings, and earned his GED. (RT 11/8/04 at 25–35, 73–74.)

Counsel presented mitigating evidence about the negative influence of McGill's girlfriend, Jonna Hardesty. McGill's family believed Hardesty was "sick," "evil," and a bad influence who "called the shots" in her relationship with McGill and isolated him from the rest of his family. (RT 11/1/04, at 57–59, 143–44; RT 11/2/04, at 25, 27–28, 60–61; RT 11/8/04 at 10, 76.) McGill told people that he wanted to get away from Hardesty, but did not leave because he was afraid she would retaliate by harming his family or setting fire to his apartment. (RT 11/2/04 at 57, 61.)

Brewer testified that the instability McGill experienced as a child disrupted his learning and impaired his socialization, behavior, and self-esteem. (RT 11/3/04, A.M., at 6; RT 11/3/04 P.M. at 54–55, 57.) She concluded that McGill was "severely" abused as a child. (RT 11/8/04 at 42–44.)

Counsel presented testimony from Dr. Lanyon. Dr. Lanyon reviewed records, met with McGill for six or seven hours, performed a neuropsychological evaluation, and administered general psychological dysfunction tests. (RT 11/8/04 at 91–92, 110.) Dr. Lanyon testified that McGill's IQ was in the average range. (*Id.* at 93.)

Dr. Lanyon testified about the effects of the instability, neglect, and abuse McGill experienced as a child. He explained that McGill had no positive male role models, nor any role models for appropriate adult relationships. (*Id.* at 97–99, 101–02,104, 116–17.)

Dr. Lanyon testified about McGill's relationship with Jonna Hardesty, whom Lanyon described as schizophrenic and "actively psychotic." (*Id.* at 95.) McGill himself

was "pathological" enough to tolerate Jonna's bizarre behavior. (*Id.* at 96.) The maternal neglect McGill experienced as a child led to a distorted view of interpersonal relationships with women. (*Id.* at 96–97.) According to Dr. Lanyon, McGill was passive in his relationship with Jonna, and "when she said jump, he jumped." (*Id.* at 95–97.)

Dr. Lanyon testified that McGill reported suffering a head injury in a car crash in 1985. (*Id.* at 105.) According to Dr. Lanyon, after the injury McGill displayed symptoms consistent with frontal lobe damage. (*Id.* at 106.) He became apathetic, lost his motivation to work, and ended up homeless before committing the armed robberies. (*Id.* at 105–06.) He also suffered depression and suicidal thoughts. (*Id.* at 107.) McGill told Dr. Lanyon that he had no memory of the robberies. (*Id.* at 106–07.)

Dr. Lanyon testified about McGill's history of substance abuse. McGill began drinking alcohol at age nine and using marijuana at thirteen. (*Id.* at 108.) He then became a heavy, chronic user of methamphetamine. (*Id.* at 109.) Dr. Lanyon testified that methamphetamine use causes paranoia and impaired judgment. (*Id.*)

Dr. Lanyon administered the Minnesota Multiphasic Personality Inventory (MMPI II). The results suggested that McGill was anxious, withdrawn, and passive. (*Id.* at 111.)

Neuropsychological testing indicated no major difficulties due to brain impairment, with the exception of evidence of brain injury related to McGill's ability to communicate, which Dr. Lanyon described as "residual impairment of brain damage." (*Id.* at 114.) There was no deficit in executive functioning. (*Id.* at 149–50.) Dr. Lanyon concluded that it was likely McGill had minimal frontal lobe damage affecting his motivation and drive rather than his cognition. (*Id.* at 175.)

Schaffer focused her closing argument on the factors that led McGill to become involved in a "sick," "codependent" relationship with Jonna Hardesty. (11/10/04 at 29.) These factors included the chaos, neglect, and abuse McGill experienced in his childhood, and the absence of role models for normal family life and healthy adult relationships. (*Id.* at 12–28.) McGill became desperate for companionship, which he found in Hardesty. (*Id.* at 29.) He was protective of her, despite her bizarre, destructive behavior, in the same way

he and his siblings were protective of their mother. (*Id.*) It was under Hardesty's influence, and in order to protect her reputation, that he committed the crimes. (*Id.* at 31.)

The jury found that the mitigating evidence was not substantially sufficient to call for leniency and determined that McGill should be sentenced to death. (*See id.* at 85.)

### 2. PCR proceedings

In his PCR petition, McGill presented several claims of ineffective assistance of counsel at sentencing. The PCR court denied all but one of these claims as not colorable. (ME 10/25/10.) The court found counsel performed reasonably in not calling an addictionologist; that there was no evidence of domestic abuse between McGill and Hardesty so counsel did not perform ineffectively in failing to secure appointment of a domestic abuse expert; and that the allegation of sexual abuse was unsubstantiated so counsel did not perform ineffectively by failing to investigate and present such evidence. (*Id.* at 3–5.)

The court held an evidentiary hearing on McGill's claim that counsel performed ineffectively by failing to retain additional experts to present evidence of his cognitive impairment and establish a causal nexus between that impairment and the crimes.

At the evidentiary hearing, held October 4 and 5, 2011, McGill submitted a number of exhibits, including an affidavit from lead counsel Schaffer; Dr. Lanyon's original report and a supplemental report; PET scan results and a report prepared by Dr. Joseph Wu, a psychiatrist and brain imaging expert; a report and supplemental report by psychiatrist Dr. Richard Rosengard; and a letter from Dr. Edward French, a pharmacologist. As discussed in more detail below, McGill also presented testimony from Schaffer, Lanyon, Wu, and Rosengard.

The PCR court denied relief, finding that counsel's performance was neither deficient nor prejudicial. (ME 10/25/11.) The court noted that trial counsel presented "a substantial amount of mitigation" concerning McGill's "dysfunctional family background, his relationship with Ms. Hardesty, and his substance abuse." (*Id.* at 7.) The court explained that counsel retained Dr. Lanyon to evaluate McGill for possible brain damage, but his

findings were not significant, and the new evidence from Drs. Wu and Rosengard was largely cumulative to the testimony of Dr. Lanyon. (*Id.* at 7–8.) The court concluded there was not a reasonable probability that their testimony at sentencing would have produced a difference outcome. (*Id.* at 8)

      <u>3.</u>   <u>Discussion</u>

McGill alleges that trial counsel performed ineffectively at sentencing by failing to (a) develop a relationship of trust with McGill and his family; (b) obtain necessary records; (c) prepare Dr. Lanyon for his testimony; (d) retain other necessary experts; (e) present evidence of substance abuse; and (f) present evidence of sexual abuse. (Doc. 30 at 67–80.) He further alleges that the PCR court erred in its findings about trial counsel's performance with respect to mitigating evidence of substance abuse, sexual abuse, and cognitive dysfunction, and was objectively unreasonable in its application of *Strickland*. (*Id.* at 57–62.)

As set forth below, the PCR court's denial of these claims was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. Consequently, because the claim does not satisfy 28 U.S.C. § 2254(d), McGill is not entitled to evidentiary development and this Court reviews the claim based on the record before the PCR court. *Pinholster*, 563 U.S. at 183, 185.

      *a.*   *Failure to develop a relationship of trust*

McGill specifically alleges that trial counsel failed to develop a relationship of trust with him and his family and as a result they were reluctant to disclose crucial mitigation information to the defense team. (Doc. 30 at 67.) This claim is meritless. First, there is no right to a "'meaningful relationship' between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 14 (1983); *see also Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008).

Next, McGill cites no support in the state court record for his assertion that a lack of trust in the defense team caused the McGills to withhold mitigating information. (*See*

Doc. 30 at 68–70.) During the PCR proceedings, McGill offered an affidavit from Schaffer in which she attested that members of McGill's family "were not forthcoming with information" and "were either dishonest or not cooperative," and that Lonnie "absolutely refused to cooperate in coming to court" and threatened to harm Schaffer or McGill's case if forced to testify. (Doc. 34, Ex. Y at 15.) McGill did not, however, offer evidence that his family distrusted the defense team. He presents that evidence for the first time in affidavits from his siblings that were prepared in 2013 for these habeas proceedings. (Doc. 70, Ex's 58, 59, and 61.) *Pinholster* forbids the consideration of this new evidence. 563 U.S. at 183, 185.

Finally, the argument that counsel performed deficiently by failing to consult with McGill is not supported by the record or the cases McGill cites. In *Summerlin v. Schriro*, 427 F.3d 623, 634 (9th Cir. 2005), "penalty phase counsel did not conduct any independent investigation, not even consulting with his client." In *Correll v. Stewart*, 137 F.3d 1404, 1412 (9th Cir. 1998), there was an "almost complete absence of effort on the part of Correll's counsel to investigate, develop, and present mitigating evidence." Here, by contrast, neither the status of the lawyer-client relationship nor the number of hours spent in direct consultation with McGill prevented counsel from investigating and presenting a wealth of mitigating information, including detailed testimony from several family members and voluminous records documenting McGill's family and social background.

### b. Failure to obtain necessary records

McGill alleges that trial counsel performed ineffectively by failing to obtain records from his juvenile adjudications, police reports from some of his prior arrests, additional school records, Ann's marriage and divorce records, his siblings' arrest records, records from Lonnie's stay at Boysville, and McGill's complete records from Buckner's Boys Ranch and Boysville. (Doc. 30 at 71.) According to McGill, these materials "include crucial evidence in mitigation of McGill's crime, including test scores and grades from third and fourth grade, information about his drug use, and information about his juvenile record." (*Id.*)

The PCR court's denial of this claim was not objectively unreasonable. *See Richter*, 562 U.S. at 105. Counsel's performance was neither deficient nor prejudicial.

As outlined above, counsel presented evidence of McGill's academic difficulties, placement in group homes, and juvenile crimes. This evidence included the extensive record compiled by Brewer and submitted as an exhibit at sentencing. (Docs. 35-1 Ex. S.) The exhibit contains records from McGill's placements at Buckner's and Boysville, school records, employment records, and military records, along with Brewer's interview notes detailing McGill's family background and personal history. (*Id.*)

The omitted materials would have covered the same ground as the records and other information counsel offered as mitigation evidence. Being cumulative, it would not "alter the sentencing profile" presented to the jury. *Strickland*, 466 U.S. at 700; *see Runningeagle v. Ryan*, 825 F.3d 970, 985 (9th Cir. 2016); *Babbitt v. Calderon*, 151 F.3d 1170, 1175 (9th Cir. 1998).

### c. Failure to prepare Dr. Lanyon

McGill alleges that counsel performed ineffectively by failing to provide Dr. Lanyon with the police reports and presentence reports from McGill's armed robberies. (Doc. 30 at 70–74.) Dr. Lanyon testified that McGill told him he had no memory of committing the robberies. Dr. Lanyon opined that the memory loss was caused by drug use or, more likely, a head injury McGill reportedly suffered shortly before the robberies. (RT 11/8/04 at 107.) On cross-examination, the prosecutor impeached Dr. Lanyon with the reports in which McGill was able to recount the details of the robberies. (*Id.* at 138–45.)

Lead counsel Schaffer testified at the PCR hearing that she made a strategic decision, after discussing the matter with co-counsel, not to provide Dr. Lanyon with the documents. (RT 10/4/11 at 142.) She was concerned about disclosing the documents because McGill "had allegedly told the probation officer when she interviewed him that he had a child . . . and he needed to get out to be with that child, and we couldn't prove that." (*Id.*) Counsel believed she was "protecting" McGill by not providing the report containing his false claim of being a father. (*Id.* at 143.)

By the time of her testimony at the PCR hearing, however, Schaffer believed she should have disclosed the reports to Dr. Lanyon. (*Id.*) Her second thoughts are not sufficient to establish deficient performance. *See, e.g.*, *Chandler v. United States,* 218 F.3d 1305, 1315 n.16 (11th Cir. 2000) (explaining that the ineffective-assistance inquiry is objective, so counsel's postconviction admission of deficient performance "matters little"). In determining whether counsel's performance was deficient, a reviewing court "will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Karis v. Calderon*, 283 F.3d 1117, 1130 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 689). McGill has not met his burden of showing deficient performance because Schaffer's choice not to provide Dr. Lanyon with the report was a strategic decision and therefore "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Although this strategy allowed the impeachment of Dr. Lanyon's testimony that McGill suffered from amnesia at the time of the armed robberies, "we do not second guess trial counsel on strategic decisions that prove to be unsuccessful." *Mayfield v. Woodford*, 270 F.3d 915, 934 (9th Cir. 2001).

The PCR court's denial of this claim was not objectively unreasonable. *See Richter*, 562 U.S. at 105.

### d.    Failure to retain other necessary experts

McGill alleges that trial counsel performed ineffectively by failing to retain additional experts to explain the nexus between the mitigation evidence and the crimes; to determine whether McGill's drug use or mental health conditions satisfied the "diminished capacity" mitigating circumstance, A.R.S. § 13-703(G)(1), or impaired his ability to premeditate; and to explain his dysfunctional relationship with Jonna Hardesty. (Doc. 30 at 74.) McGill also argues that counsel should have retained the type of expert to whom he would have been comfortable disclosing his alleged childhood sexual abuse. (*Id.* at 74–75.) He asserts that "Schaffer's use of Dr. Lanyon at trial did not discharge her duty to retain other necessary expert witnesses." (Doc. 30 at 75.)

In support of these allegations during the PCR proceedings, McGill presented testimony from two experts in addition to Dr. Lanyon. Dr. Wu testified that McGill's PET

scan revealed a decrease in frontal lobe activity relative to the occipital cortex and asymmetry between the left and right superior parietal lobule. (RT 10/4/11 at 83–85, 88.) He explained that the frontal lobe governs impulse control and judgment, and the asymmetry revealed in McGill's PET scan was consistent with Dr. Lanyon's report of some impairment in language and symbolic skills. (*Id.* at 84–85, 89.) Dr. Wu testified that the scan, although conducted eight years after the crimes, most likely reflected the state of McGill's brain at the time of the murder. (*Id.* at 89–90.) Dr. Wu also opined that although recent drug use may affect a PET scan, any abnormality caused by drug use would no longer be visible on a PET scan after about six months. (*Id.* at 103–04, 117.) Dr. Wu acknowledged that a PET scan alone cannot be used to render a diagnosis. (*Id.* at 71.)

Dr. Rosengard testified that childhood trauma of the kind McGill experienced increases the likelihood of later substance abuse and other difficulties. (RT 10/5/11 at 16–19.) He opined that McGill exhibited "Stockholm Syndrome" in his relationship with Jonna Hardesty, and diagnosed McGill with traits of dependent personality disorder. (*Id.* at 19–23.)

Dr. Rosengard also testified, contrary to Dr. Wu's opinion, that brain damage caused by substance abuse is "permanent and irreversible." (*Id.* at 29–30.) He testified that Dr. Wu's findings were helpful because they corroborated his "concern . . . that there may be some neuropsychiatric pathology or damage to the brain." (*Id.* at 26.) Dr. Rosengard agreed with Dr. Lanyon, however, that McGill had no cognitive deficits. (*Id.* at 47.) Dr. Rosengard concluded that McGill's history of trauma and abuse, along with his dependent personality disorder, combined to lower his ability to resist Hardesty's will, and that the brain damage suggested by Dr. Wu's report affected his ability to make good decisions. (*Id.* at 52–53.)

Dr. Lanyon reviewed Dr. Wu's PET scan results during the preparation of his supplemental report for the PCR proceedings. (*Id.* at 30.) He testified that Dr. Wu's findings would have aided his earlier evaluation only "in one minor way": the impairment Dr. Wu observed in the left parietal area was consistent with Dr. Lanyon's findings of minor impairment in McGill's speech and language functioning. (*Id.* at 30.) Dr. Lanyon

reiterated that he found no evidence of frontal lobe damage in his evaluation. (*Id.* at 31.) He concluded that Dr. Wu's findings would not have altered or even corroborated his original evaluation and trial testimony because the findings were "too minor" and "no smoking gun." (*Id.* at 33, 55.)

Following the hearing the PCR court rejected McGill's ineffective-assistance claim, finding neither deficient performance nor prejudice. (ME 10/25/11.) The court found that Dr. Lanyon's evaluation of McGill was "thorough and complete," that counsel presented substantial mitigation evidence, and that the new evidence offered by Drs. Wu and Rosengard was cumulative and not significant enough to have resulted in a reasonable probability of a life sentence if presented at sentencing. (*Id.* at 8.) This decision was neither contrary to nor an unreasonable application of clearly-established federal law.

At sentencing, counsel presented mitigating evidence concerning McGill's psychological condition as it related to the murder and evidence about the nature of his dysfunctional relationship with Jonna Hardesty. The jury was not, as McGill argues, "left to wonder why McGill stayed with Hardesty despite her bizarre and abusive behavior." (Doc. 30 at 75.) Instead, family members and Dr. Lanyon testified about the dynamics of the relationship and its negative effects on McGill. He was under her control, passive, a follower; she was violent, destructive, controlling, and a bad influence. (*See* RT 11/1/04 at 58, 144–45; RT 11/2/04 at 26–28, 55–57, 76–83, 94–95.) Dr. Lanyon described Hardesty as "actively psychotic." (RT 11/8/04 at 95–96.) He explained that McGill was particularly vulnerable to Hardesty because of his own pathologies and the distorted view of relationships he developed as the child of a neglectful mother. (*Id.* at 97–98.) Dr. Lanyon testified that to "survive emotionally" McGill had to accommodate his mother's behavior in abandoning and neglecting him. (*Id.*) He repeated this pattern in his relationship with Hardesty, tolerating her bad behavior in order to preserve the relationship. (*Id.* at 98.)

Counsel did not perform ineffectively by failing to hire another expert to explain McGill's relationship with Hardesty. Dr. Rosengard's diagnosis of dependent personality disorder does nothing but add a name to the condition described by the witnesses at

sentencing, including Dr. Lanyon, who detailed the dysfunctional relationship between McGill and Hardesty. Dr. Wu simply echoed Dr. Lanyon's opinion that only a pathological person would maintain a relationship with a person like Hardesty. (RT 10/4/11 at 93.)

Similarly, McGill has not shown that counsel performed ineffectively by failing to retain experts who could establish a connection between McGill's psychological condition and the crimes. The testimony of Drs. Wu and Rosengard at the PCR evidentiary hearing does not support this claim. They offered little new information about McGill's neuropsychological condition. Dr. Wu's interpretation of the PET scan, showing a decrease in frontal lobe activity, was consistent with the testimony Dr. Lanyon offered at sentencing. (*See* RT 10/4/11 at 100–01.)

The PCR court correctly determined that this evidence was cumulative. (Doc. 34, Ex. Y at 8.) It did not "alter[] the sentencing profile" presented to the jury. *Strickland*, 466 U.S. at 700; *see Runningeagle*, 825 F.3d at 985; *Babbitt*, 151 F.3d at 1175.

In denying this claim the PCR court also found that "Dr. Lanyon is a qualified expert and Ms. Schaffer was entitled to rely on the competency of his evaluation of the defendant." (ME 10/25/11 at 4.) McGill contends that this conclusion was unreasonable (Doc. 30 at 61–62), citing Schaffer's assertion that Dr. Lanyon "did a horrible job of preparing for his testimony" and "was not qualified for the tasks presented in Mr. McGill's case." (Doc. 34, Ex. Y at 13–14.)

McGill's argument is unpersuasive. First, the PCR court correctly noted that Schaffer was entitled to rely on Dr. Lanyon. Beyond Schaffer's opinion, nothing in the record indicates that Dr. Lanyon was not qualified to examine McGill. *See Turner v. Calderon*, 281 F.3d 851, 876 (9th Cir. 2002). Reliance on a "properly selected expert" is "within the wide range of professionally competent assistance." *Harris v. Vasquez,* 949 F.2d 1497, 1525 (9th Cir. 1990). In fact, Dr. Wu testified at the PCR evidentiary hearing that Dr. Lanyon administered a comprehensive battery of neuropsychological tests. (RT 10/4/11 at 100–101.)

Next, even if McGill offered valid challenges to Dr. Lanyon's performance, "[t]he Constitution does not entitle a criminal defendant to the effective assistance of an expert witness." *Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998); *see Harris*, 949 F.2d at 1518; *Silagy v. Peters*, 905 F.2d 986, 1013 (7th Cir. 1990). Therefore, "while there may be a duty to seek out psychiatric evaluation of a client where appropriate, there is no duty to ensure the trustworthiness of the expert's conclusions." *Babbitt*, 151 F.3d at 1174; *cf. Hendricks v. Calderon*, 70 F.3d 1032, 1038–39 (9th Cir. 1995) ("To now impose a duty on attorneys to acquire sufficient background material on which an expert can base reliable psychiatric conclusions, independent of any request for information from an expert, would defeat the whole aim of having experts participate in the investigation.").

As the PCR court found, trial counsel performed reasonably in using Dr. Lanyon as an expert at sentencing.

### e.     Failure to present evidence of substance abuse

McGill alleges that counsel performed ineffectively by failing to "obtain detailed evidence regarding McGill's history of drug use, or establish with any certainty the amount and type of substances McGill had abused in the days and hours leading up to the crime." (Doc. 30 at 76.)

The addiction expert approved by Schaffer's office, Dr. Mace Beckman, a medical doctor from California, would not assist in McGill's defense because McGill refused to admit his involvement in the crimes.[4] (RT 10/4/11 at 130, 147–48.) Counsel did not retain another addiction expert. The PCR court found that counsel's "tactical decision not to call Dr. Beckman was reasonable." (ME 10/25/10 at 4.) The court considered Dr. French's letter but found that because he did not evaluate McGill his testimony about McGill's drug use and its effects would be speculative and "add nothing to Dr. Lanyon's testimony." (*Id.*) This decision was not contrary to or an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts.

---

[4] The Office of Legal Advocate approved the appointment of Dr. Beckman after denying counsel's request to appoint Dr. Lesley Hoyt-Croft, a substance abuse counselor.

At sentencing, Dr. Lanyon testified about McGill's extensive drug abuse. McGill reported using marijuana from the age of 13 and, except for his periods of incarceration, had used it daily since. (RT 11/8/04 at 108–09.) After his release from prison in 1993, "he became a heavy crystal meth user instead, a daily crystal meth user." (*Id.* at 109.) Dr. Lanyon testified that methamphetamine use causes paranoia and impairs judgment, and chronic use "would remove any remaining fragment of ability to reason." (*Id.*) In addition, Dr. Lanyon's report, admitted at trial, stated that McGill "had been actively using methamphetamine and had been awake for several days at the time of the events with which he is charged." (Doc. 34, Ex. S at 260.)

McGill argues that it was not reasonable for counsel to rely on Dr. Lanyon's testimony because "methamphetamine use was not his area of expertise." (Doc. 30 at 76–77.) This ignores the fact that Schaffer had retained the addiction specialist who was authorized by her office, but he refused to evaluate McGill based on McGill's unwillingness to acknowledge his participation in the crimes. McGill offers only speculation that an alternative course of action by counsel, such as renewing her request for a different addictionologist, would have resulted in the appointment of an expert whose testimony about McGill's drug use would have been more persuasive than Dr. Lanyon's. (*See* Doc. 30 at 77.)

"The choice of what type of expert to use is one of trial strategy and deserves 'a heavy measure of deference.'" *Turner*, 281 F.3d at 876 (quoting *Strickland*, 466 U.S. at 691); *see Harris*, 949 F.2d at 1525. In *Turner*, the Ninth Circuit rejected the claim that counsel performed ineffectively by retaining a general psychologist and not an expert on PCP. 281 F.3d at 876. The court held that the argument that "a more specialized expert would have been more persuasive" failed to support a claim of ineffective assistance of counsel. *Id.*; *see Richter*, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

In addition, McGill cannot establish that he was prejudiced by counsel's inability to retain a different expert. McGill presented the PCR court with the letter by Dr. French discussing the effects of methamphetamine use.(Doc. 35-4, Ex. QQ.) Dr. French explained that chronic use can cause "methamphetamine psychosis," with effects such as delusions, hallucinations, paranoia, and impulsive and aggressive behavior. (*Id.* at 3.) Citing the PET scan that showed an abnormality "compatible with brain injury or neuropsychiatric illness," Dr. French opined that "the combination of heavy chronic methamphetamine abuse and an underlying brain injury negatively affected Mr. Gill's [sic] cognitive abilities and control over his behavior." (*Id.* at 4.)

Dr. French's opinions are not sufficient to establish that the PCR court's findings were objectively unreasonable. As the PCR court noted, Dr. French, unlike Dr. Lanyon, did not evaluate McGill to determine the extent of his drug use preceding the murder. (ME 10/25/10 at 4.) Even assuming counsel had been able to retain an expert such as Dr. French, and that the expert's opinions after examining McGill were consistent with the opinions offered in Dr. French's letter, McGill cannot show that he was prejudiced by counsel's performance. Dr. French's findings are not substantially different from Dr. Lanyon's testimony about the effects of chronic methamphetamine use on McGill at the time of the murder. The jury was fully aware that McGill abused methamphetamine and was impaired at the time of the crimes.

### f.    Failure to present evidence of sexual abuse

McGill alleges that counsel performed ineffectively by failing to present evidence that McGill had been sexually abused at Boysville. (Doc. 30 at 60, 77–80.) In raising this claim during the PCR proceedings, McGill relied on Dr. Rosengard's report, dated March 1, 2010, which stated that "[McGill] indicated that he was abused in a boys' home by an older boy, when he was 8 or 9 and raped two different times by that person. He hit that person with a two-by-four and then the abuse stopped."[5] (Doc. 52-3, Ex. 48 at 4.) The PCR

---

[5] McGill stated that the abuse occurred at Buckner's. (PCR petition at 31.) Lonnie Foster also stated in his 2010 affidavit that the abuse occurred at Buckner's. (Doc. 35-4,

court found the ineffective-assistance claim was not colorable because the allegation of sexual abuse was unsubstantiated. (ME 10/25/10 at 5.) This decision was not contrary to or an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts before the court.

In his report Dr. Lanyon noted that McGill had denied any sexual abuse. (Doc. 34, Ex. S at 259.) McGill now claims, however, that trial counsel should have pursued the issue because "there were several indications that McGill had been sexually assaulted while at Boysville," including the fact that "sexual abuse and assault are all too common in such institutions" and that his half-brother Lonnie reported being sexually abused at Boysville. (Doc. 30 at 78.) Therefore, according to McGill, "Even if [he] did deny being sexually abused during this interview, [counsel] should not have considered that statement to indicate that no further investigation was necessary." (*Id.* at 79.)

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691. The Ninth Circuit has explained that "counsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence." *Babbitt*, 151 F.3d at 1174 (quoting *Matthews v. Evatt*, 105 F.3d 907, 920 (4th Cir. 1997)). Accordingly, "[a]n attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him." *Newland v. Hall*, 527 F.3d 1162, 1202 (11th Cir. 2008) (quoting *Williams v. Head*, 185, 1223, 1237 (11th Cir. 1999)); *see Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1210–11 (11th Cir. 2007) (denying claim of ineffective assistance based on counsel's failure to discover defendant's childhood abuse because defendant never told counsel about it); *Henyard v. McDonough*, 459 F.3d 1217, 1245 (11th Cir. 2006) (determining that counsel did not perform deficiently by failing to investigate or present evidence of defendant's childhood

---

Ex. NN at 2.) Despite this, the claim now is that McGill and Lonnie were both abused at Boysville.

sexual abuse because defendant denied being sexually abused). "It is black-letter law that counsel cannot be found deficient for believing what his client plausibly tells him." *Mickey v. Ayers*, 606 F.3d 1223, 1242 (9th Cir. 2010).

Lonnie's claim that he was sexually abused did put the defense team on notice of the issue, but both McGill and his brother Cordell denied being sexually abused. There is no support for McGill's argument that counsel ignored the issue. To the contrary, McGill's mitigation specialist focused much of her investigation on McGill's placement at Boysville, speaking to institution's current administration, gathering records, and interviewing family members. That evidence was presented to the jury. The fact that the defense team did not find evidence of an event McGill denied does not render counsel's performance ineffective. *See Babbitt*, 151 F.3d at 1174 (finding counsel's failure to uncover family history of mental illness was "not unreasonable" where "[c]ounsel's investigator did speak with Babbitt's family members and friends and others who might have had such information, but none of them indicated there was any history of mental illness in Babbitt's family.").

"[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691. Here, it was not unreasonable of counsel to fail to discover evidence of an incident that McGill explicitly denied and did not disclose until six years after his trial. McGill does not cite any additional steps counsel could have taken that would have led him to disclose the alleged sexual abuse.

### 4.   Conclusion

"The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam) (citations omitted). Under *Strickland*'s highly deferential standard, counsel's performance at McGill's sentencing was "well within the range of professionally reasonable judgments." *Van Hook*, 558 U.S. at 12 (quoting *Strickland*, 466 U.S. at 699).

In *Van Hook*, defense counsel spoke with the defendant's mother, father, aunt, and a family friend; met with two expert witnesses; reviewed military and medical records; and considered retaining a mitigation specialist. *Id.* at 9–10. Counsel presented mitigating evidence about the defendant's traumatic childhood and his impairment on the day of the crime. *Id.* The Court found that the scope of counsel's investigation was reasonable even though counsel did not interview all of the defendant's relatives or the psychiatrist who treated his mother. *Id.* at 11.

In McGill's case, the defense team exceeded the scope of the investigation in *Van Hook*, and their efforts produced a thorough picture of McGill's tumultuous childhood, his substance abuse, his mental health, and his relationship with Hardesty. As with *Van Hook*, "[t]his is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained." 558 U.S. at 11 (citations omitted). Although McGill argues that the mitigation investigation should have produced more or different information, the scope of the investigation was not limited and counsel did not ignore any potential leads. "[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Babbitt*, 151 F.3d at 1173 (quoting *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998)). Here, the choices made by counsel were reasonable. *See Cox*, 613 F.3d at 896 (finding "counsel's thorough mitigation investigation was more than reasonable. Counsel interviewed most of Petitioner's close relatives, CYA counselors, school teachers, and other people familiar with Petitioner's background").

In addition, McGill has failed to show he was prejudiced by counsel's performance at sentencing. To establish prejudice, McGill must demonstrate "a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing," and "that had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Belmontes*, 558 U.S. at 20 (quoting *Wiggins v. Smith*, 539 U.S. 510, 535, 536

(2003)); *see Apelt v. Ryan*, 878 F.3d 800, 832 (9th Cir. 2017) (setting out the steps for analyzing prejudice).

McGill cannot make that showing. The evidence he alleges was omitted was either cumulative or unsubstantiated. The additional evidence concerning McGill's brain abnormality and substance abuse adds little weight to the evidence offered at sentencing. McGill's claim that he was sexually assaulted at Boysville remains, as the PCR court found, unsubstantiated and contradicted by his earlier denial of abuse, reducing whatever weight it would have had as a mitigating circumstance.

The new evidence does not "clear[] the first hurdle" of "paint[ing] a very different picture of [McGill's] background and character than was presented at sentencing." *Apelt*, 878 F.3d at 832; *see Strickland*, 466 U.S. at 700. The portrait of McGill's background and character as presented at sentencing was not altered by the new evidence produced during the PCR proceedings. Trial counsel presented the jury with evidence of McGill's chaotic and traumatic childhood, his history of substance abuse and possible brain impairment, and the causes and results of his dysfunctional relationship with Jonna Hardesty. The Arizona Supreme Court recognized that the mitigating evidence presented at sentencing was "not insignificant." *McGill*, 213 Ariz. at 162, 140 P.3d at 945.

Because the essentials of McGill's mitigating case were unchanged by the new evidence developed during the PCR proceedings, McGill "has not shown that, after reweighing the aggravating and mitigating evidence, there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Apelt*, 878 F.3d at 832–33. A reasonable jurist could find that totality of the mitigating evidence, when reweighed against the gruesome nature of the crime and the strong aggravating factors, was not sufficient to establish a reasonable probability that McGill would not have been sentenced to death absent trial counsel's errors. *See id.* at 833; *Belmontes*, 558 U.S. at 27–28.

As the Ninth Circuit has observed, "There will always be more documents that could be reviewed, more family members that could be interviewed and more psychiatric

examinations that could be performed." *Leavitt v. Arave*, 646 F.3d 605, 612 (9th Cir. 2011). In McGill's case, the record before the PCR court demonstrated that counsel conducted a reasonable investigation and that, even if the scope of the investigation had been expanded, significant new mitigation evidence was not available.

Accordingly, under AEDPA's doubly deferential standard, *Richter*, 562 U.S. at 105, the PCR court's denial of the claim does not satisfy 28 U.S.C. § 2254(d). Claim 1 is denied. McGill's request for evidentiary development of the claims is also denied.

**Claim 2:**

McGill alleges that trial counsel performed ineffectively at the aggravation phase of sentencing by failing to challenge the prior serious offense aggravating circumstance, A.R.S. § 13-751(F)(2). (Doc. 30 at 85.) McGill contends that counsel should have reduced the weight of the factor by presenting evidence that he suffered from brain injury and cognitive dysfunction, and that at the time of the prior offenses he was intoxicated and unarmed. (*Id.* at 86, 88.)

McGill raised this claim in his PCR petition. The court rejected the claim as not colorable:

> The Court understands this claim to be made in the context of mitigation at the penalty phase. The defendant does not contest the validity of this prior conviction [sic] as a (F)(2) aggravator; rather, he appears to argue that its severity could have been minimized by showing the effect that his alleged brain damage had on its commission. This assertion is speculative and not substantiated by any of the exhibits offered by the defendant. Further, Defendant recounted his prior crimes in detail on cross-examination (as he did to the presentence writer), undermining any claim that he blacked out or could not recall his crimes. He plead guilty, not no contest, and the F(2) factor is the fact of conviction.

(ME 10/25/10 at 5–6.) McGill contends that the PCR court's decision was based on an unreasonable determination of the facts. (Doc. 30 at 85.)

Respondents acknowledge that the PCR court erred in stating that McGill testified about his prior convictions. The court was correct, however, in noting that McGill was able to recount the details of the robberies, as he did when questioned by the police.

McGill contends that the PCR court also erred in characterizing as speculative and unsubstantiated McGill's assertion that brain damage affected his conduct in committing the robberies. (Doc. 30 at 86–87.) This finding was reasonable. The reports of Drs. Wu and Rosengard did not substantiate a claim that brain damage affected McGill's conduct in committing the robberies in 1985. To the contrary, as described above, the evidence supporting that assertion was supplied by Dr. Lanyon at sentencing.

Moreover, counsel did investigate the robberies and presented evidence and argument at sentencing to put the crimes in context and minimize their seriousness. Mitigation specialist Brewer testified that McGill was not in fact armed, but had placed his hand in his jacket pocket to simulate a gun. (RT 11/8/04 at 22.) The jury also heard this fact when the prosecutor read McGill's version of the crimes from a police report during Dr. Lanyon's cross-examination. (*Id.* at 139–45.) Dr. Lanyon also testified that McGill was homeless, "living hand to mouth," and drinking when he committed the robberies. (*Id.* at 106–07.)

During her closing argument counsel addressed the robberies and placed them in context of McGill's life circumstances at the time:

> So Leroy at that point is homeless and he's drinking and he's probably using drugs and he does some armed robberies for petty cash and these are serious offenses. We in no way mean to minimize them. We know that he was drinking at the time that these offenses occurred.
>
> I would invite you to look at the presentence reports that talk about these offenses, it gives you a glimpse into Leroy's life at this time. He is staying at a girl named Debbie's house, he's staying in an abandoned car in Cortez Park. He's desperate for money. He's basically just hanging out jobless and he robs a Dairy Queen and a donut store for some chump change. And he paid for those crimes with eight years of his life.

(RT 11/10/04 at 22.)

The PCR court's denial of this claim was not contrary to or an unreasonable application of *Strickland.* Trial counsel presented the evidence McGill contends was omitted, including the fact that McGill was not actually armed when he committed the robberies and that he was impaired by alcohol and possibly suffering from brain damage at the time. McGill does not cite additional evidence that would have more-effectively

- 29 -

challenged the prior offenses as an aggravating factor. To the extent the aggravating factor's weight could be minimized, counsel performed competently.

Claim 2 is denied. Because 28 U.S.C. § 2254(d) is not satisfied, *Pinholster* bars the introduction of new evidence and McGill's request for evidentiary development is denied.

**Claim 3:**

McGill alleges that counsel performed ineffectively during jury selection by failing to rehabilitate a prospective juror ("Juror 21") who expressed opposition to the death penalty. (Doc. 30 at 89.) McGill did not raise this claim in state court. He argues that its default is excused under *Martinez*. The Court disagrees. PCR counsel did not perform ineffectively by failing to raise this claim, so the default is not excused.

Based on her response to a question on the juror questionnaire, the State and McGill's counsel stipulated that Juror 21 be excused for cause. (RT 10/12/04 at 3.) Counsel stipulated to the dismissal despite having attempted to rehabilitate two other prospective jurors who also expressed unequivocal reservations about the death penalty. (*See* Doc. 30 at 92.) According to McGill, this means that counsel performed ineffectively by failing to do the same for Juror 21.

McGill cannot meet his burden of showing deficient performance based simply on the fact that counsel proceeded differently with respect to individual jurors who expressed opposition to the death penalty. *See Bridge v. Lynaugh*, 838 F.2d 770, 776 (5th Cir. 1988) ("A trial counsel's decision not to attempt to rehabilitate a venire member under such circumstances does not constitute ineffective assistance of counsel."). He cannot rebut the presumption that counsel acted reasonably in stipulating to the excusal of Juror 21. *See Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001) ("Counsel is also accorded particular deference when conducting voir dire. An attorney's actions during voir dire are considered to be matters of trial strategy.").

Because the underlying allegation of ineffective assistance of trial counsel is not substantial and unsupported by any factual basis, PCR counsel did not perform

ineffectively by failing to raise the claim. *See Sexton*, 679 F.3d at 1157. Claim 3 remains procedurally defaulted and barred from federal review.

**Claim 29:**

McGill alleges that his appellate counsel performed ineffectively by failing to raise meritorious claims. (Doc. 30 at 164.) He did not raise the claim in state court. Its default is not excused under *Martinez. See Davila*, 137 S. Ct. at 2062–63. Claim 29 is denied as barred from federal review.

**B.      Remaining Exhausted Claims**

McGill raised the following claim on direct appeal, where they were rejected by the Arizona Supreme Court. McGill is not entitled to relief on these claims.

**Claim 10:**

McGill alleges that the State failed to prove the "zone of danger" aggravating factor set forth in A.R.S. § 13-703(F)(3).[6] (Doc. 30 at 114.) McGill contends that the Arizona Supreme Court's rejection of this claim, *McGill*, 213 Ariz. at 154, 140 P.3d at 937, was contrary to or an unreasonable application of clearly established federal law and based on an unreasonable determination of the facts.

Whether a state court misapplied an aggravating factor to the facts of a case is a question of state law. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Federal habeas review of a state court's application of an aggravating factor is limited to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation. *Id.* The appropriate standard of federal habeas review of a state court's application of an aggravating circumstance is the "rational factfinder" standard: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found" the aggravating factor to exist. *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

---

[6] The trial court granted McGill's motion to dismiss the (F)(3) factor as it related to Mary Near, a neighbor who lived in an adjoining apartment, because McGill did not know the apartment was occupied.

1    Section 13-703(F)(3) establishes an aggravating factor when "[i]n the commission

2    of the offense the defendant knowingly created a grave risk of death to another person or

3    persons in addition to the person murdered during the commission of the offense." The

4    State must prove that "during the course of the killing, the defendant knowingly engaged

5    in conduct that created a real and substantial likelihood that a specific third person might

6    suffer fatal injuries.'" *State v. Carreon*, 210 Ariz. 54, 67, 107 P.3d 900, 913 (2005) (quoting

7    *State v. Gonzales*, 181 Ariz. 502, 514, 892 P.2d 838, 850 (1995)). The factor requires proof

8    that others are physically present in the "zone of danger" created by the murderous act. *Id.*

9        In finding that the State proved this factor, the Arizona Supreme Court explained

10   that because McGill knew that Uhl and Yates were in the apartment "the only questions

11   remaining are whether McGill should have known that he would create a risk of grave harm

12   to the two men and whether he did create such a risk." *McGill*, 213 Ariz. at 154, 140 P.3d

13   at 937. The court answered the questions in the affirmative:

14           McGill set two people on fire using gasoline in a very small
             apartment. He used enough gasoline to cause the entire structure to quickly
15           become engulfed in flames. On the other hand, both of these adult men easily
             escaped the burning apartment. Yates was awake behind a closed door, and
16           Uhl had just let McGill into the apartment and was aware of McGill's plan
             based on his conversation with him moments earlier. The law does not
17           require, however, that McGill's actions be the most risky imaginable. McGill
             "[wa]s aware or believe[d]," that setting the structure on fire "created a grave
18           risk of death," for Uhl and Yates. The State proved this aggravator beyond a
             reasonable doubt.
19
20   *Id.* (citations omitted).

21       A reasonable fact-finder, viewing the evidence in the light most favorable to the

22   prosecution, could have determined that the (F)(3) factor was satisfied. *See Jeffers*, 497

23   U.S. at 780. According to Banta's testimony, Yates and Uhl were present in the living room

24   with her and Perez when McGill entered the apartment, tossed the gasoline, and started the

25   fire.[7] (RT 10/20/04 at 48.) Gasoline was found not only on the victims' clothes but on

26

27   _____

         [7] When interviewed by Detective Kulesa, McGill indicated that Yates was in the
28   bedroom with the door closed when the fire started. (*See* RT 10/25/04 at 37–38.) Again, in
     reviewing this claim the Court must assess the evidence in the light most favorable to the
     prosecution. *See Jeffers*, 497 U.S. at 780.

carpet pad samples taken near the front door. (RT 10/21/04 at 98–99.) The fire destroyed Yates's apartment and spread to the adjoining apartment. When Yates escaped from the apartment he was coughing so hard he had difficulty speaking and was given oxygen. (RT 10/20/04 at 93–94.) Based upon these circumstances, a rational trier of fact could have found that McGill knowingly created a grave risk of death to another person when he used an accelerant to start a fire in a small one-bedroom apartment.

Claim 10 is denied

**Claim 11:**

McGill contends that his rights under the Double Jeopardy Clause were violated when he was convicted of endangerment and the same conduct was used as an aggravating factor in sentencing him to death. (Doc. 30 at 118.) The Arizona Supreme Court denied this claim on direct appeal. *McGill*, 213 Ariz. at 153–54, 140 P.3d at 936–37.[8] McGill asserts that the ruling was an unreasonable application of clearly established federal law. This claim is denied because there was no double jeopardy violation.

The Double Jeopardy Clause of the Fifth Amendment protects against a second prosecution for the same offense after acquittal or conviction and against multiple punishments for the same offense. *Schiro v. Farley*, 510 U.S. 222, 229 (1994). Clearly-established federal law holds that the sentencing phase of a capital case is not a successive prosecution for double jeopardy purposes. *Id.* at 230; *Williams v. Oklahoma*, 358 U.S. 576 (1959). "Aggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between the alternative verdicts of death and life imprisonment." *Poland v. Arizona*, 476 U.S. 147, 156 (1986) (quoting *Bullington v. Missouri*, 451 U.S. 430, 438 (1981)). Therefore, use of prior convictions to enhance a sentence for a subsequent offense does not constitute double jeopardy. *Schiro*, 510 U.S. at 230; *see Witte v. United States*, 515 U.S. 389, 399 (1995) (holding that use of evidence of

---

[8] In rejecting this claim, the Arizona Supreme Court found that double jeopardy was not violated because the crimes of endangerment and first-degree murder did not satisfy the same-elements test set out in *Blockburger v. United* States, 284 U.S. 299 (1932). *McGill*, 213 Ariz. at 153–54, 140 P.3d at 936–37. The Court need not reach that issue.

related criminal conduct to enhance a defendant's sentence for a separate crime does not constitute punishment for that conduct within the meaning of the Double Jeopardy Clause); *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988) ("[T]he fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.").

McGill's rights under the Double Jeopardy Clause were not violated by the use of the "zone of danger" aggravating factor. Claim 11 is denied.

**Claim 12:**

McGill alleges that his Fifth and Sixth Amendment rights were violated when the court dismissed a potential juror ("Juror 58") for cause "based on her generalized objections to the death penalty." (Doc. 30 at 120.) The Arizona Supreme Court denied this claim on direct appeal. *McGill*, 213 Ariz. at 152, 140 P.3d at 935.

Clearly established federal law provides that in a capital case jurors cannot be struck for cause "because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 & n.21 (1968) (noting that exclusion for cause is appropriate if views on the death penalty would prevent prospective jurors "from making an impartial decision as to the defendant's guilt"). "[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45 (1980); *see Wainwright v. Witt*, 469 U.S. 412, 424 (1985).

A trial judge's exclusion of a juror for cause is a finding of fact entitled to deference. 28 U.S.C. § 2254(e)(1); *see Witt*, 469 U.S. at 428–29. McGill bears the burden of rebutting the presumption with clear and convincing evidence. *Id.*

The Arizona Supreme Court held that the trial court did not abuse its discretion in dismissing the juror for cause because her religious "beliefs would 'substantially impair the performance of [her] duties.'" *McGill*, 213 Ariz. at 152, 140 P.3d at 935 (quoting

- 34 -

*Wainwright*, 469 U.S. at 424 n.5). This decision was neither contrary to nor an unreasonable application of *Witherspoon*, nor was it based on an unreasonable determination of the facts. As the court noted, "When asked explicitly, 'Do you think that your ability to do the things that you're supposed to do as a juror—do you think that ability would be impaired,' Juror 58 said, 'Yes.'" *Id.*

McGill relies on an exchange with the judge where Juror 58 suggested that she could follow the law and impose the death penalty. (RT 10/13/04 at 44.) She immediately qualified that answer, however, by explaining that she would follow the law only "because you guys would come after me . . . but I'd still have like the fear of God on my shoulders." *(Id.* at 43–44.) Apart from this equivocal response, Juror 58 was consistent in stating that her opposition to the death penalty would impair her ability to perform her duties as a juror. For example, on the juror questionnaire she responded repeatedly that her religious beliefs would prohibit her from voting for a death sentence.

The record supports a finding that under *Witherspoon* Juror 58 was properly excused for cause. The Arizona Supreme Court's denial of this claim does not satisfy § 2254(d). Claim 12 is denied.

**Claims 13 and 14:**

In Claim 13, McGill alleges that the admission of testimonial hearsay during the penalty phase of his trial violated his rights under the Confrontation Clause. (Doc. 30 at 123.) In Claim 14, he alleges that the evidence violated his right to due process. (*Id.* at 130.) The Arizona Supreme Court rejected these claims on direct appeal. *McGill*, 213 Ariz. at 156–161, 140 P.3d at 939–944. These rulings were not contrary to or an unreasonable application of clearly established federal law, nor were they based on an unreasonable determination of the facts.

To rebut McGill's mitigation evidence, the State presented, over defense objections, testimony from Steve Lewis, an investigator with the Maricopa County Attorney's Office, and Detective Tom Kulesa. Lewis testified about a statement made by inmate Floyd Lipps. (RT 11/9/04 at 49.) Lipps, who died before trial, claimed that McGill had asked him to kill

Uhl because McGill believed that the State could convict him only if Uhl testified. (*Id.* at 59–60.) Lewis also testified that Lipps gave the State a note that contained a description of Uhl. (*Id.* at 61.)

Detective Kulesa testified that he had interviewed Uhl, who also died before trial. (*Id.* at 96.) He testified that Uhl had identified McGill as the person who set Banta and Perez on fire and provided details that were corroborated by the testimony of other witnesses. (*Id.* at 99–103.)

In denying McGill's Confrontation Clause argument, the Arizona Supreme Court relied on *Williams v. New York*, 337 U.S. 241, 250–51 (1949), which held that hearsay is admissible in sentencing proceedings. *McGill*, 213 Ariz. at 158, 140 P.3d at 941. McGill argues that *Williams* was overruled by *Crawford v. Washington*, 541 U.S. 36, 54–55 (2004), which held that the Confrontation Clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." The Ninth Circuit has rejected this argument, however, explaining that "the law on hearsay at sentencing is still what it was before *Crawford*: hearsay is admissible at sentencing, so long as it is accompanied by some minimal indicia of reliability." *United States v. Ingham*, 486 F.3d 1068, 1076 (9th Cir. 2007) (quoting *United States v. Littlesun*, 444 F.3d 1196, 1200 (9th Cir. 2006)); *see Sivak v. Hardison*, 658 F.3d 898, 927 (9th Cir. 2011) (explaining that *Williams* remains dispositive on the issue of confrontation rights at sentencing). Claim 13 is meritless.

In addressing McGill's due process challenge to the use of testimonial hearsay at sentencing, the Arizona Supreme Court explained that a defendant may "not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.'" *McGill*, 213 Ariz. at 160, 140 P.3d at 943 (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 n.1 (1986)). The court also noted that such evidence must "bear some indicia of reliability." *Id.*

The court determined that these due process requirements were satisfied in McGill's case, first noting that "McGill does not argue that he lacked notice of and an opportunity to respond to the contents of Lipps's and Uhl's statements." *Id.* The court then explained that statements were accompanied by sufficient indicia of reliability:

> Other evidence corroborated Uhl's statement, thereby providing indicia of reliability. The testimony of Banta, Johnson, and Keith corroborated the information Uhl provided Detective Kulesa. Sufficient indicia of reliability also supported Lipps's statement. The note that Lipps produced contained McGill's fingerprints and handwriting; Uhl, the target of the murder for hire, indeed could have been a witness against McGill; Uhl's physical appearance matched the description on the note; and Lipps did have an opportunity to receive the note from McGill. All these facts corroborate the account that Lipps gave.

*Id.* at 160–61, 140 P.3d at 943–44.

McGill contends that these conclusions are based on an unreasonable determination of the facts. (Doc. 30 at 132–34.) He points to inconsistencies between Uhl's statement and the testimony of trial witnesses Johnson and Keith, who indicated that "Uhl played a much larger role in the events leading up to the fire than Uhl's statements to Kulesa indicated." (*Id.* at 132.) In the face of the testimony that directly corroborated information in Uhl's statement—that McGill put pieces of Styrofoam in the cup of gasoline, threw the mixture on Perez and Banta, and set them on fire—this inconsistency does not satisfy the "daunting standard" of § 2254(d)(2). *See Maddox*, 366 F.3d at 1000.

McGill likewise asserts that the Arizona Supreme Court made an unreasonable factual determination in finding that Lipps' statement was sufficiently reliable. (*Id.* at 133–34.) He suggests that his fingerprints and handwriting on the note "could easily have been a fabrication or manipulation orchestrated by Lipps." (*Id.*) This speculation falls far short of satisfying McGill's burden under § 2254(d)(2) and (e)(1). *See Maddox*, 366 F.3d at 1000.

Claims 13 and 14 are denied.

1          **Claim 15:**

2          McGill alleges that his rights under the Eighth and Fourteenth Amendments were

3   violated by Arizona's requirement that mitigating factors be proved by a preponderance of

4   the evidence. (Doc. 30 at 134.) The Arizona Supreme Court denied the claim on direct

5   appeal. *McGill*, 213 Ariz. at 161, 140 P.3d at 944.

6          The Supreme Court has upheld the constitutionality of Arizona's death penalty

7   sentencing scheme, including its requirement that a defendant bear the burden of proving

8   mitigating circumstances sufficiently substantial to call for leniency. *See Walton v.*

9   *Arizona*, 497 U.S. 639, 650 (1990) *overruled on other grounds by Ring v. Arizona*, 536

10  U.S. 584 (2002). The decision of the Arizona Supreme Court denying relief on this claim

11  was neither contrary to nor an unreasonable application of clearly established federal law.

12  Claim 15 is denied.

13         **Claim 16:**

14         McGill contends that the State's failure to allege the aggravating circumstances in

15  the indictment violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Doc.

16  30 at 136.) The Arizona Supreme Court denied the claim on direct appeal. *McGill*, 213

17  Ariz. at 162, 140 P.3d at 945.

18         While the Due Process Clause guarantees defendants a fair trial, it does not require

19  the states to observe the Fifth Amendment's provision for presentment or indictment by a

20  grand jury. *Hurtado v. California*, 110 U.S. 516, 538 (1884); *Branzburg v. Hayes*, 408 U.S.

21  665, 688 n.25 (1972). Although McGill contends that *Ring* and *Apprendi v. New Jersey*,

22  530 U.S. 466 (2000), support his position, in neither of those cases did the Supreme Court

23  address this issue, let alone hold that aggravating factors must be included in an indictment

24  and subjected to a probable cause determination. *See Ring*, 536 U.S. at 597 n.4. The

25  Arizona Supreme Court has expressly rejected the argument that *Ring* requires aggravating

26  factors to be alleged in an indictment and supported by probable cause. *McKaney v.*

27  *Foreman*, 209 Ariz. 268, 270, 100 P.3d 18, 20 (2004). Claim 16 is without merit and will

28  be denied.

**Claim 17:**

McGill alleges that the application of Arizona's newly-enacted death penalty statute violated the *ex post facto* doctrine. (Doc. 30 at 138.) The Arizona Supreme Court denied the claim. *McGill*, 213 Ariz. at 162, 140 P.3d at 945.

On June 24, 2002, the United States Supreme Court invalidated Arizona's death penalty scheme under which judges rather than juries found the facts making a defendant eligible for the death penalty. *Ring*, 536 U.S. 584. On August 1, 2002, Arizona amended its death penalty statute to comply with *Ring*. McGill murdered Perez on July 3, 2002. He argues that when he committed the murder "Arizona did not have a constitutional death penalty statute in effect." (Doc. 30 at 139.) Therefore, according to McGill, he could not have been sentenced to death under the law in place at the time of the murder, and application of the amended statute constituted an *ex post facto* violation. (*Id.* at 130–40.)

In denying this claim, the Arizona Supreme Court cited its opinion in *State v. Ring*, 204 Ariz. 534, 545–47, 65 P.3d 915, 926–28 (2003), holding that the *ex post facto* clause did not prohibit the resentencing of capital defendants after *Ring v. Arizona* because the new statute provided for only procedural changes and did not place defendants in jeopardy of a greater punishment. *McGill*, 213 Ariz. at 162, 140 P.3d at 945.

The *ex post facto* doctrine prohibits a state from "retroactively alter[ing] the definitions of crimes or increas[ing] the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43 (1990). "[A]ny statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*." *Dobbert v. Florida*, 432 U.S. 282, 292 (1977) (quoting *Beazell v. Ohio*, 269 U.S. 167, 169–70 (1925)).

In *Dobbert*, the defendant was sentenced to death in Florida under a capital sentencing system that was subsequently declared unconstitutional. 432 U.S. at 288. Dobbert argued that he could not be sentenced to death under the amended Florida

- 39 -

procedures because at the time of his original sentencing the death penalty was not an available punishment. *Id.* at 297. The Supreme Court rejected this argument and held there was no *ex post facto* violation because the changes in Florida's statute were "clearly procedural." *Id.* at 293. "The new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime." *Id.* at 293–94.

Under *Dobbert*, the post-*Ring* procedural changes in Arizona's death penalty are not *ex post facto* laws. *See Schriro v. Summerlin*, 542 U.S. 348, 353–54 (2004) ("*Ring*'s holding is properly classified as procedural."). Nonetheless, McGill argues that "the newly enacted death penalty statute changes the 'quantum' of punishment attached to the crime of homicide, because for thirty-eight days prior to the statute's enactment, the death penalty was not an available punishment and the maximum sentence available was life without the possibility of parole." (Doc. 30 at 140.)

This argument is not distinguishable from the claim rejected in *Dobbert*, where the defendant contended there was "no death penalty 'in effect' in Florida" when he committed the murders. 432 U.S. at 297. The Court responded that "this sophistic argument mocks the substance of the Ex Post Facto Clause." *Id.* Similarly, the statute in place at the time McGill committed the murder and the statute enacted after *Ring* provided for the same quantum of punishment. While *Ring* invalidated the procedure by which the death penalty was imposed in Arizona, it did not eliminate the death penalty as a possible sentence for first-degree murder.

The decision of the Arizona Supreme Court rejecting McGill's *ex post facto* claim was neither contrary to nor an unreasonable application of clearly established federal law. Claim 17 is denied.

**Claim 18:**

McGill alleges that Arizona's "heinous, cruel, or depraved" aggravating factor does not genuinely narrow the class of death-eligible offenders, in violation of the Eighth and

Fourteenth Amendments. (Doc. 30 at 143.) The Arizona Supreme Court denied the claim on direct appeal. *McGill*, 213 Ariz. at 162, 140 P.3d at 945.

Rulings of both the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors, including the "heinous, cruel, or depraved" factor, do not adequately narrow the sentencer's discretion. *See Jeffers*, 497 U.S. at 774–77; *Walton*, 497 U.S. at 652–56; *Woratzeck v. Stewart*, 97 F.3d 329, 334–35 (9th Cir. 1996). The Ninth Circuit has also explicitly rejected the contention that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998). Claim 18 is denied.

**Claim 19:**

McGill alleges that the trial court improperly permitted the introduction of victim impact evidence in violation of his due process and Eighth Amendment rights and his rights under the Confrontation Clause. (Doc. 30 at 147–52.) The Arizona Supreme Court denied McGill's Confrontation Clause argument on direct appeal. *McGill*, 213 Ariz. at 162, 140 P.3d at 945.

Respondents contend that McGill's due process and Eighth Amendment claims are unexhausted. The Court disagrees. In his appellate brief McGill claimed that the introduction of the victim impact evidence "violated [McGill's] constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments." (Doc. 34, Ex. A at 153.) This reference to a "specific provision[] of the federal constitution" is sufficient to fairly present the claim, *Lyons v. Crawford*, 232 F.3d 666, 670 (9th Cir. 2000), *as modified by* 247 F.3d 904 (9th Cir. 2001), and the Court will consider its merits.

In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the introduction of a victim impact statement during the sentencing phase of a capital case violated the Eighth Amendment. The Court revisited *Booth* in *Payne v. Tennessee*, 501 U.S. 808, 827, 830 (1991), overruling it in part and holding that the Eighth Amendment does not erect a per se barrier to the admission of victim impact evidence but leaving

intact *Booth*'s prohibition on characterizations and opinions from the victim's family about the crime, the defendant, or the appropriate sentence. *Id.* at 830 n.2.

In rebuttal to McGill's mitigation evidence, the State presented a victim impact statement in the form of a letter written by Perez's sister, Lizette. The prosecutor read the letter to the jury. (RT 11/9/04 at 44–47.) In the letter, Lizette stated that she could not believe how Perez looked after the fire and recalled that he was bandaged from head to toe. (*Id.* at 46.) She also described her reaction to the gruesome autopsy photos of her brother, telling the jurors that she "couldn't believe that a human person could do that to another person." (*Id.* at 47.) McGill argues that these statements constitute improper characterizations and opinions regarding McGill and the crime. (Doc. 30 at 150–51.)

These brief, isolated portions of the letter, which otherwise expressed Lizette's feelings about her brother and the impact of his murder, were arguably comments about McGill and the crime. They were not, however, unduly prejudicial. *See Payne*, 501 U.S. at 825.

First, the trial court provided the following instruction with respect to the victim impact evidence:

> The victim's sister has made a statement relating to the personal characteristics of the victim and the impact of his murder on the victim's family. You may consider this information only to the extent that it may rebut the mitigation presented by the defendant. You may not consider the information as a new aggravating circumstance.

(RT 11/10/04 at 10.)

The jury is presumed to follow its instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200 (1987)). McGill's assumption that his jury considered the excerpts from Lizette's letter for improper purposes ignores the plain language of the instructions given at trial.

Moreover, taken in context, Lizette's brief comments about her brother's condition after the burning would not have prejudiced the jury, which was fully aware of the nature of the crime and had viewed photos of Perez's body. Lizette did not express an opinion about the proper sentence or otherwise attack McGill. The bulk of her statement consisted

of permissible comments about her brother and the effect of this death. Therefore, admission of the statement did not have a "substantial and injurious effect or influence in determining" McGill's sentence. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see, e.g.*, *Hooper v. Mullin*, 314 F.3d 1162, 1174 (10th Cir. 2002) (applying harmless error standard to admission of improper victim impact statement).

The due process and Eighth Amendment allegations of Claim 19 are denied. The Confrontation Clause allegation is denied for the reasons discussed in the Court's analysis of Claim 13.

**Claim 20:**

McGill alleges that the trial court's jury instructions improperly limited the mitigation evidence the jury could consider in violation of McGill's rights under the Eighth and Fourteenth Amendments. (Doc. 30 at 152.) The Arizona Supreme Court denied the claim on direct appeal. *McGill*, 213 Ariz. at 162, 140 P.3d at 945. That decision was neither contrary to nor an unreasonable application of clearly established federal law.

The court instructed McGill's jury: "You should not guess about any fact and you must not be influenced by mere sympathy or by prejudice in determining these facts." (RT 11/10/04 at 4–5.) The court also instructed the jurors that mitigating circumstances "may be any evidence presented by either the defendant or the state that would lead you to apply leniency in this case and find that death is not an appropriate sentence," and that the evidence to consider in determining mitigation "includes any aspect of the defendant's background, character, propensity or record, and any of the circumstances of the offense that might justify a penalty less severe than death." (*Id.* at 7–8.) The court also explained that, "You are free to assign whatever value you deem appropriate to each and all of the various factors you are permitted to consider." (*Id.* at 9.)

State jury instructions must be upheld against constitutional attack unless "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). At the penalty phase of a capital trial, this requires that "the sentencer

. . . be able to consider and give effect to mitigating evidence in imposing the sentence, so that the sentence imposed reflects a reasoned moral response to the defendant's background, character, and crime." *Penry v. Johnson*, 532 U.S. 782, 788 (2001) (quotations and citations omitted).

"[F]ederal courts have consistently held that jury instructions admonishing the jury to base its penalty determination on mitigating or aggravating evidence, not on sympathy for the defendant, pass constitutional muster." *Mayfield*, 270 F.3d at 923; *see, e.g.*, *Victor v. Nebraska*, 511 U.S. 1, 13 (1994); *California v. Brown*, 479 U.S. 538, 542–43, (1987). In *Brown*, the trial court had instructed the jury that it "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." 479 U.S. at 540. The Court found that a reasonable juror would understand the instruction "as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase." *Id.* at 542. The Court held that an "instruction prohibiting juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at the trial, does not violate the United States Constitution." *Id.* at 543.

The trial court's jury instructions, which were indistinguishable from those in *Brown*, did not prevent the consideration of constitutionally relevant mitigation evidence. Claim 20 is denied.

**Claim 21:**

McGill alleges that his Fifth Amendment rights were violated because the Arizona Supreme Court improperly weighed his silence when reviewing the propriety of his death sentence. (Doc. 30 at 155.) McGill raised this claim in a motion for reconsideration (Doc. 34, Ex. F at 5–7), which the Arizona Supreme Court denied. (*Id.*, Ex. G.)

The claim is based on the following passage in the Arizona Supreme Court's opinion:

> During her closing argument at the penalty phase, McGill's attorney reminded the jury that "[t]he evidence suggests that [Hardesty] is very, very much in control of this relationship with [McGill] and evidence suggests that

> [McGill] will do anything, absolutely anything to keep [Hardesty] happy."
> McGill did not, however, provide any evidence that Hardesty specifically
> urged him to murder Perez. . . . Moreover, McGill did not explain why, when
> in jail and outside the influence of Hardesty, he nonetheless attempted to
> have Uhl killed. Although McGill demonstrated that Hardesty influenced
> him, the preponderance of the evidence does not suggest that her influence
> was so strong as to explain his conduct.

*McGill*, 213 Ariz. at 161, 140 P.3d at 944. McGill contends that the court "impermissibly drew adverse inferences from [his] failure to provide information that would have required his personal testimony." (Doc. 30 at 156.)

In *Mitchell v. United States*, 526 U.S. 314 (1999), the Supreme Court held that the Fifth Amendment applies to sentencing proceedings and therefore no adverse factual inference may be drawn from a defendant's silence during a sentencing hearing. 526 U.S. at 329–30. However, as Respondents argue, the Arizona Supreme Court, in commenting about the lack of evidence supporting McGill's arguments about Hardesty's influence over his conduct, was properly weighing a mitigating circumstance put forward by McGill. It was McGill's burden to prove his mitigating circumstances by a preponderance of the evidence. The Arizona Supreme Court's comments represent an assessment of the evidence McGill presented, not an inference drawn from his silence.

McGill cites no clearly established federal law prohibiting the sentencing jury from drawing a negative inference from a defendant's silence with respect to a mitigating factor that the defendant has introduced and for which he bears the burden of proof. *See Mitchell*, 526 U.S. at 330 (leaving open the question of whether, at sentencing, a defendant's silence "bears upon the determination of a lack of remorse"); *White v. Woodall*, 572 U.S. 415, 420 (2014) (explaining that the *Mitchell* holding only precludes negative inferences of a defendant's assertion of his or her Fifth Amendment privilege pertaining to the facts of the underlying crime and left open whether sentencing courts might permissibly draw some inferences for other purposes).

The state court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law. Claim 21 is denied.

**Claim 22:**

McGill alleges that the death penalty is categorically cruel and unusual punishment in violation of the Eighth Amendment. (Doc. 30 at 156.) The Arizona Supreme Court's denial of this claim, *McGill*, 213 Ariz. at 162, 140 P.3d at 945, was neither contrary to nor an unreasonable application of clearly established federal law. There is no clearly established federal law supporting the claim that the death penalty is categorically cruel and unusual punishment or that it serves no purpose. *See Hall v. Florida*, 134 S. Ct. 1986, 1992–93 (2014); *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). Claim 22 is denied.

**Claim 23:**

McGill alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it affords the prosecutor with unbridled discretion to seek the death penalty. (Doc. 30 at 157.) The Arizona Supreme Court denied the claim on direct appeal. *McGill*, 213 Ariz. at 162, 140 P.3d at 945.

Prosecutors have wide discretion in deciding whether to seek the death penalty. *See McCleskey v. Kemp*, 481 U.S. 279, 296–97 (1987); *Gregg*, 428 U.S. at 199 (explaining that pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional). In *Smith*, the Ninth Circuit rejected the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." 140 F.3d at 1272. Claim 23 is meritless and will be denied.

**Claim 24:**

McGill alleges that Arizona's capital sentencing scheme discriminates against poor, young, and male defendants in violation of the Fourteenth Amendment. (Doc. 30 at 158.) The Arizona Supreme Court denied the claim on direct appeal. *McGill*, 213 Ariz. at 162, 140 P.3d at 945.

Clearly established federal law holds that "a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'"

and must demonstrate that the purposeful discrimination "had a discriminatory effect" on him. *McCleskey*, 481 U.S. at 292 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)). Therefore, to prevail on this claim, McGill "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* McGill does not attempt to meet this burden. He offers no evidence specific to his case that would support an inference that his sex, age, or economic status played a part in his sentence. *See Richmond v. Lewis*, 948 F.2d 1473, 1490–91 (9th Cir. 1990), *vacated on other grounds*, 986 F.2d 1583 (9th Cir. 1993) (holding statistical evidence that Arizona's death penalty is discriminatorily imposed based on race, sex, and socioeconomic background is insufficient to prove that decision-makers in his case acted with discriminatory purpose). Claim 24 is denied.

**Claim 25:**

McGill alleges that Arizona's capital sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments because it denies capital defendants the benefit of proportionality review of their sentences. (Doc. 30 at 159.) The Arizona Supreme Court rejected the claim on direct appeal. *McGill*, 213 Ariz. at 163, 140 P.3d at 946.

There is no federal constitutional right to proportionality review of a death sentence, *McCleskey*, 481 U.S. at 306 (citing *Pulley v. Harris*, 465 U.S. 37, 43–44 (1984)), and the Arizona Supreme Court discontinued the practice in 1992, *State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992). The Ninth Circuit has explained that the interest implicated by proportionality review—the "substantive right to be free from a disproportionate sentence"—is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996). Claim 25 is denied.

**Claim 26:**

McGill alleges that Arizona's capital sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments because it does not require the State to prove or the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. (Doc. 30 at 160.) The Arizona Supreme Court denied the claim on direct appeal. *McGill*, 213 Ariz. at 163, 140 P.3d at 946.

There is no Supreme Court authority requiring a jury to be instructed on a burden of proof in the sentencing phase of a capital case. Further, "[t]he United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed." *Harris v. Pulley*, 692 F.2d 1189, 1195 (9th Cir. 1982), *rev'd on other grounds*, 465 U.S. 37 (1984). Nor is there any Supreme Court authority which would require a burden of proof or persuasion be assigned to any of the jury's penalty phase determinations. On the contrary, the Supreme Court has held that a "capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 979 (1994); *see Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988) ("[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."); *Zant v. Stephens*, 462 U.S. 862, 875 n.13 (1983) (explaining that "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required"). Because the Arizona Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law, nor an unreasonable determination of facts, Claim 26 is denied.

**Claim 27:**

McGill alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it does not sufficiently channel the discretion of the sentencing authority. (Doc. 30 at 161.) The Arizona Supreme Court denied the claim on direct appeal. *McGill*, 213 Ariz. at 163, 140 P.3d at 946.

The Ninth Circuit has rejected the contention that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith*, 140 F.3d at 1272. The Arizona capital sentencing scheme requires proof of a specific "aggravating circumstance" before a sentence of death may be imposed. *See* A.R.S. § 13-703.1(D). This is an accepted "means of genuinely narrowing the class of death-eligible persons." *See Lowenfield*, 484 U.S. at 244. Claim 27 is denied.

**Claim 28:**

McGill alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a death sentence whenever an aggravating circumstance and no mitigating circumstances are found with respect to an eligible defendant. (Doc. 30 at 162.) The Arizona Supreme Court denied the claim on direct appeal. *McGill*, 213 Ariz. at 163, 140 P.3d at 946.

The Supreme Court has rejected the argument that Arizona's death penalty statute is impermissibly mandatory and establishes a presumption of death because it provides that the death penalty "shall" be imposed if one or more aggravating factors are found and mitigating circumstances are insufficient to call for leniency. *See Walton*, 497 U.S. at 651–52 (citing *Blystone v. Pennsylvania*, 494 U.S. 299, 255 (1990)); *see also Kansas v. Marsh*, 548 U.S. 163, 172–73 (2006) (relying on *Walton* to uphold Kansas's death penalty statute, which directs imposition of the death penalty when the state has proved that mitigating factors do not outweigh aggravators); *Smith,* 140 F.3d at 1272 (summarily rejecting challenges to the mandatory nature of Arizona's death penalty statute). Therefore, the Arizona Supreme Court's balancing test for the weighing of aggravating and mitigating circumstances is not unconstitutional. Claim 28 is denied.

## IV.    CERTIFICATE OF APPEALABILITY

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the

issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claim 1, alleging ineffective assistance of counsel at sentencing.

## V. CONCLUSION

Based on the foregoing,

**IT IS HEREBY ORDERED** that McGill's Petition for Writ of Habeas Corpus (Doc. 30) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on May 31, 2012 (Doc 5), is **VACATED.**

**IT IS FURTHER ORDERED** that McGill's motion for evidentiary development (Doc. 57) is **DENIED.**

**IT IS FURTHER ORDERED** granting a certificate of appealability with respect to Claim 1.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

Dated this 9th day of January, 2019.

Honorable John J. Tuchi
United States District Judge